# CHICAGO PACKING & PROVISION COMPANY

## v.

# MICHAEL H. ROHAN.

*Master and Servant—Negligence of Master—Injury to Servant—Packing Houses—Ordinance of the City of Chicago as to Safeguards—Assumption of Risk.*

1.  The ordinance of the city of Chicago touching "proper safeguards" for vats containing hot liquid, means proper safeguards with reference to the work to be done; one which, while affording reasonable security, does not unreasonably interfere with the work which must be performed.

2.  Only an expert in a given business can tell whether a railing around a given vat was a proper safeguard.

3.  It was error in the case presented, to leave the jury, by the instruction, free to say as to whether the railing in question was a "proper safeguard," no evidence having been introduced on this point.

4.  A person can not recover for an injury arising from improper safeguards, where he continues at work with knowledge thereof, without complaint.

5.  In the case presented, this court holds that the judgment for the plaintiff can not stand, upon the ground that the plaintiff, when injured, was not in the exercise of ordinary care.

[Opinion filed January 30, 1893.]

APPEAL from the Superior Court of Cook County; the Hon. ELLIOTT ANTHONY, Judge, presiding.

Appellee, while working as a steam fitter in the packing house of appellant, walked into a vat of boiling water and was severely injured. He brought suit against appellant and recovered a verdict and judgment for $12,800.

Appellee narrates the circumstances attending the accident as follows:

"On Monday, October 13, 1890, I was working for the packing company. We had been working on some flanges in the engine room. I went up stairs to collect some tools which I had left over Saturday and when I got in there the

room was full of steam, there was no light, and I walked into a vat of boiling water. All of my flesh fell off when they took my clothes off.

It is twelve feet from the floor of the press room to the level of the vats. There is a three-board railing protecting the edge of the vats where they come up to the press room. This railing extends around the edge on three sides of the room. There was also, at that time, upon the railing, a trough, which carried the lard out of the kettles opposite the three-board railing. That chute was on the side of the three-board railing next to the vats.

The lard trough, with reference to the railing, was on a level with the railing, on the inside; hanging on the inside. The distance from the railing to the planks is very short; there is nothing to walk upon except some removable planks. The distance from the railing to tank five is about eight feet, but I have never measured it. The depth of vat five at the time of my injury was, I think, four feet six inches. This vat was covered by movable planks that you could pick up and throw aside to skim the vats. Sometimes when they were through the planks were left off. They generally had a light in front of the uncovered vat, but there was no light when I went up.

The vats were covered with removable planks. There was no covering but removable planks. Inside of the railing there was one plank with posts on it to hold it up, to hold up this lard trough; there was cross-beams over the railing to hold it from tipping over; the plank was about nine inches wide; from that to the tank there was nothing but movable planks.

I do not know the exact height of tank five at the time I was injured; I know that it leads into the third floor, where it is filled.

The material was boiled in water in the tank.

The manhole of tank five was right over vat five, about two inches above the level of the top of the vat. I fell into vat five. Our work bench was on the same level with the vats in the next room west. All of the vats from vat three

to vat ten were not on the same level; vat four, the one next to the window and next to the one into which I fell, projects about two feet higher than the one into which I fell.

My position at the time of the accident was with the packing company as a steam fitter. I was supposed to go to any part of the building and do everything that was necessary to be done, like putting in line pipe work for steam or water, all over the house.

The last that I had been working in the vat room was on Saturday. I worked on the pump at the end of those vats—at the end of vat one. The reason I went into the vat room was to get some tools which I had left there on Saturday and had not taken in.

There was no other way of getting into the vat room where the tools were from the engine room.

After entering the door I proceeded east toward tank eight or three.

I came in at that door and walked east toward vat five which was uncovered and full of liquid, and there was so much steam in the room that I could not see. I was coming around to the end of tank one and before I got to my destination I fell into the vat, and was pulled out again and my flesh fell off and I was attended by a doctor. As I walked between vats ten and eleven I kept pretty close to the railing, but there was nothing there to protect me. I fell in vat five next to the railing where the lard ran through.

The only means of natural light in the room was one window and that was covered by a bridge.

The stock yards road runs between this building and the next building. The two buildings are about 100 feet apart. The window was in a dirty condition at that time.

This window was the only means, at that time, of lighting the room from the outside that I know of. There was no manner of artificial light in the room at that time.

(By the court: Was there any light in the room?)

No, sir. The steam from the kettles filled the room and there was no ventilation for it.

I do not remember seeing any planks or three planks nailed together on vat five at that time.

I put the coils on quite a few of the tanks at the bottom; on the bottom of the iron tank. I had to get inside of the tank to do that. I would get inside of the tank to put the coils in. The opening to go through is the door from the vat—slide door from the vat. There is a slide door in each tank from each vat. That may be about two inches higher than the level of the top of the vat. I mean the slide door is about two inches higher than those boards on top of the vat. I had been down in those vats. I have put lines in those vats to keep that stuff from rusting on them, and I have put in perforated steam pipes in the bottom of the vats. I do not know how many I have worked in, I did not keep track. I always went in when I was called upon, and fixed them and walked out again.

I have been in those vats a great many times while I was employed there. As I recollect, at the time of, and immediat ly prior to, the time of the accident, the vats were covered with removable planks; they slide both ends on the center between each two vats; the one on the center of the vat shoves up and the other one stayed on a piece of 2x4, and when they are covered over they all come level with the top of the vat; come perfectly level when they are shut down. And they are supported on a partition, and on that partition was a little cleat just below the edge of these boards, and these boards were on these cleats, so when they were through and the vats were covered up, it made a level walk. I have not had occasion to move these boards. I never moved them at all. The men working in the room always moved them. I set them back after them. I have seen them put the boards on top of one another, or on top of another vat. The trough for conveying the lard out is four or five feet, as high as the railing. At the time of the accident it was not eighteen inches higher than the railing. It has been the practice in that house, and in any other packing house, for the steam-fitter to go to the different parts of the building. He may be in one place in the morning,

and another place in the afternoon. On the Saturday pre-vious to my being hurt, I worked on that pump in the after-noon.

I was working with Feers, outside of the room, in the forenoon. I was working in the engine-room across the street. Mr. Feers was helping me on that pump Saturday. If there were three windows in the room they were closed with iron shutters. I only knew of one window at the end of the vat room, directly opposite vat four. That would be opposite to the way I was walking ahead of me. I don't know anything about the rules of a tank room. I have seen a vat man at work. I saw them skim them and scrape them and clean them. They skim the lard off the vats. When they skim the lard off, they leave some of the boards that cover the vats on; generally leave two or three on near the railing, and take the others off. Those that he leaves on he kneels on, I suppose. I have seen them skimming at all times of the day. I do not know how often they skim the vats. I suppose they skim them every time they dump the tank in, may be every day, may be once a week, or once in three months.

The vat men generally use their lights when they skim the vats. They generally put them beside them to see whether they are skimming grease or not. I guess they put their lights right beside the open vat to see what they are skimming out; I have seen them do it. I did not see Mr. Burns until he pulled me out of the vat. I did not see where he was. I didn't see O'Donnell either until he helped me out of the vat. Mr. O'Donnell might have been skimming the vat, but I could not see him with steam. I can't swear that he was skimming the vat that I fell into. I didn't see him.

I did not grab O'Donnell just as I went into the vat, I grabbed the fence railing. I don't know where O'Donnell's torch and lantern were at that time. I did not see the torch there at all, and I did not see the lantern at all. I didn't see that either before or after I was injured. I did not have a light with me. I did not carry one at all. We did not have

Chicago Packing & Provision Co. v. Rohan.

one with us. Saturday, when we were working, we had torches that were in the room. When the vats are not in use, when the boards are over them, when they are not being skimmed and the stuff is boiling underneath, there is more or less steam comes out. The steam, I suppose, comes up through the cracks of the boards.

(Ques.) When the vat is being skimmed, Mr. Rohan, isn't there a larger volume of steam than when the boards are over it and it is simply oozing through the cracks?

(Ans.) There is steam in them all of the time. You can't tell. I suppose if a man is there whose business it is to be there, he could tell. I never paid any particular attention to it.

I think the vats are about eight feet high, six or eight feet, that is, from the bottom of the vats to the floor. I guess the three-board railing is about three feet six high. I walked next to the railing that day. I did not have my hand on the railing; there was a trough that prevented it. I could not get my hand on the top of the railing very handy."

Sub-sec. 81, Sec. 63, Art. V, Chap. 24, R. S. (Starr & Curtis), gives the city of Chicago power " to direct the location and regulate the management and *construction* of packing houses, renderies   *   *   *   within the city limits and within a radius of one mile without the city limits."

Under authority of this statute the city of Chicago has created the following ordinance :

" Every vat, bin or other structure with molten metals or hot liquids shall be surrounded with proper safeguards for preventing accident or injury to those employed at or near them."

Upon the trial the court, at the instance of the plaintiff, gave to the jury the following instruction :

" If you believe from the evidence that the vat or structure containing the hot liquid, in which the plaintiff fell and was scalded, was not surrounded with safeguards for preventing accident or injury to those employed at or near it at the time when the injury occurred, as provided in the ordinances of the city of Chicago pleaded in the declaration, and

offered and given in evidence in this case; and if you further believe from the evidence that the absence of such safeguards was the direct cause of the injury complained of in this case, and if you further find, from a consideration of all the evidence in the case, that just before and at the time of the accident the plaintiff was exercising reasonable care and caution, under all the circumstances, for his own safety, then the defendant would be liable."

Messrs. EDWIN WALKER and ARTHUR J. EDDY, and MORAN, KRAUS, MAYER & STEIN, for appellant.

The law is so conclusively settled that a servant assumes all the well known and obvious risks of employment, that we do not believe it will be seriously contended that Rohan could recover at common law.

He was perfectly familiar with the tank room, the construction of the vats, and the uses to which they were put. He had no business upon the vats at the time of the accident. He was not sent there in the performance of any duties; he entered the room of his own free will, and, as he claimed, in search of tools which he had left there the Saturday previous.

The defendant owed him no duty at that time and under the circumstances to have the vats covered or guarded in any manner whatsoever. Neither the defendant nor any of its servants had any reason to expect that Rohan would attempt to cross the vats at the time he did. On the contrary, the vats at that time were in the sole and exclusive charge of the vat men, and the very vat he fell into was being skimmed by the vat man, O'Donnell.

Rohan was at most a mere licensee. If, as he claimed, he left his tools there on Saturday previous, that was his own carelessness, and he had no more right to be in that vat room on the day he was hurt than any other workman in the employment of the defendant, working in some distant part of the building.

There is no negligence, unless there is a duty, and unless the defendant company at the time of the accident owed

Rohan the duty of guarding and protecting the vat other than it was, it could be guilty of no negligence.

"To constitute negligence there must be some duty owing from the party whose negligence occasions the loss to the party inured." Deering on Negligence, Sec. 3; Wharton on Negligence, Sec. 3.

"Negligence consists in the commission of some lawful act in a careless manner, or in the omission to perform some legal duty, to the injury of another. It is essential in the latter case to establish that the defendant owed at that time some specific, clear, legal duty to the plaintiff or the party injured." Nicholson v. Ry. Co., 41 N. Y. 520; Splittorf v. Stole (N. Y.), 15 N. E. Rep. 322; Cusick v. Adams (N. Y.), 21 N. E. Rep. 673; Larmore v. Crown Point Iron Co., 14 N. E. Rep. 752; C., R. I. & P. Ry. Co. v. Eininger, 114 Ill. 79, 84.

The case of Chicago & Aurora Smelting & Refining Co. v. Collins, decided by this honorable court at the October term last, opinion filed January 14, 1892, opinion by Gary, J., is directly in point. That was a case where Collins, appellee, had left his lunch-pail in one part of the building, and leaving his work in another part, took, to him, an unknown route in trying to reach his lunch-pail, and stepped into a kettle of molten lead.

This honorable court, in its opinion says:

"The appellee was employed by the corporation, working nights; but his labor did not call him to the immediate vicinity of the kettles, though on the night before his injury he was engaged in wheeling bullion past one of the plants, within forty feet, more or less, of the kettles, and saw men with torches working around the kettles. On the fourth night of his employment he was set at work in a lead-pit, from which access to that plant could be had by going up some steps and stepping over a trench or bin for holding coal, to the floor where the kettles were. He had left his lunch at some other part of the premises, and in the night, wanting it, and having seen others go up those steps, he took that, to him, unknown route, to the place where he had left it. In so doing he walked into the molten lead in the

smallest kettle of the plant, sustaining very severe and probably permanent injury, and suffering prolonged and excruciating pain.

For that injury he sues, grounding his action on a supposed neglect of duty of the appellant to keep premises reasonably safe, or warn employes of the danger.

Many cases on this subject are collected in Thomp. Neg. 1244. But the question whether, upon the facts in evidence, there was such a duty, is before us. The appellee was not sent by the appellant to the place where the kettles were, nor put at any work that would take him near them. The most that can be said is, that, being employed in the works, he had an implied license to go, and was not a trespasser in going where his duty did not call him, taking an unknown route on an errand of his own. To such facts the principle and authorities upon which Gibson v. Sziepienski, 37 Ill. App. 601, was decided, apply. .

The appellant was under no duty to make all parts of the premises safe for a stranger to them to ramble through in the night, even if he was at work for it, in a part where there was no danger.

It is assigned for error that the court refused to instruct the jury to find for the defendant, and also that a new trial was denied.

Both assignments are sustained, the judgment reversed and the cause remanded."

In Gibson, Parish & Company v. Sziepienski, Admx., 37 Ill. App. 601, decided by this honorable court, opinion by Waterman, J., the deceased went to the factory where his son worked, to take his son's dinner to him. Entering a passage-way that led to the elevator shaft, he fell down it and was killed. The court say:

"It will be perceived that the declaration first alleges that it was the duty of the defendants to maintain a guard or barrier around the shaft or hole to prevent persons, who might come into the factory with their permission, from falling into said opening. We do not so understand the law.

The rule as stated in Wharton on Negligence, Sec. 350,

is: ' If I invite persons into my house for no specific business, and, therefore, as no part of a contract, I say to them, " Take me as you find me. I do not pretend to guarantee anything. If the house is not too old and rickety for me, it is not too old and rickety for you, if I give you *bona fide* what I keep for myself. At all events you can no more complain if you choose to come into my house, on my invitation, that you have to encounter the same risks in it I am accustomed to encounter, than you can complain, if you drop in to dine with me, that I give you potluck." '

Hence, it is properly held that a man does not undertake to make his home safe, so far as concerns mere visitors."

In Shearman & Redfield on Negligence, Sec. 705, the rule is thus stated :

" A mere passive acquiescence on the part of the owner or occupant, in the use of real property by others, does not involve him in any liability to them for its unfitness for such use. They take all risks upon themselves, and have no right to complain of any defect in the premises, even though caused by the direct act of the owner ( *e. g.*, a pit sunk in the land ), unless the act is malicious, or is committed with notice of the fact that strangers are likely to approach, and without any effort to warn them of the danger, under circumstances which justify a belief that the owner was indifferent to the injuries which might happen to them."

To the same effect are the cases of Murray et al. v. McLean, Admr., 57 Ill. 378 ; McGill v. Compton, 66 Ill. 327 ; Illinois Central R. R. Co. v. Carraher, 47 Ill. 333 ; Turner v. Klekr, 27 Ill. App. 391. The declaration does not charge that the deceased was more than a mere licensee in the building by the permission of the defendant.

Most factories have in them dangerous places, and dangerous machinery; as to persons in the building by the mere permission of the proprietors, the law does not impose upon them the duty of guarding such dangerous objects so that visitors shall receive no harm.

In Trask v. Shotwell et al. (Minn.), 42 N. W. Rep. 699,

plaintiff, as administrator, brought suit for the death of his intestate, who fell through an unguarded elevator shaft upon the premises of defendant. There was no dispute that the plaintiff, Trask, had business upon the premises of the plaintiff, but not in the immediate vicinity of the elevator. The elevator was a freight elevator solely. Verdict was directed for the defendant, and the Supreme Court, after saying that he entered the apartment where the elevator was, solely of his own motion, concludes by saying :

"Applied to the undisputed facts in this case, we are brought to the conclusion that the trial court did not err in its instructions to the jury. In order to maintain this action, there should have been shown to exist, some obligation or duty toward plaintiff's intestate, which the defendant had left undischarged or unfulfilled. There could be no fault or negligence, or breach of duty, where there had not been an act or a service which the defendants were bound to perform."

In Wright v. Rawson (Iowa), 3 N. W. Rep. 106, the deceased was a miner, employed in defendant's mine, and the admitted facts on demurrer were, that the deceased, who was at work in one part of the mine, went into a room where other miners were employed for the purpose of visiting those miners, and not while in the performance of any duty. The declaration charged that the defendant and his superintendent knew that it was the custom of miners in his mine, when not actually engaged in work, to visit each other in their respective rooms, and that with full knowledge of such custom the defendant acquiesced in it, and permitted it. It is also charged that the defendant had negligently permitted the supports of the roof of the room to become weakened, and be in a dangerous condition, which was well known to the defendant, and to his superintendent. While deceased was in the room as above stated, the roof fell in and killed him.

On demurrer the Supreme Court of Iowa held that at the time of the accident the deceased had left his proper place of employment, and sought the dangerous room, not while

in the performance of his duties, but upon an errand of his own, and his administrator therefore could not recover, even though the roof and its supports were in a defective and dangerous condition. See also Evans v. A. & P. R. R., 62 Mo. 49.

Mr. E. F. MASTERSON, for appellee.

A servant, upon entering the employment, takes upon himself the risk of all obvious dangers of the manner of appliances with which he is to perform his duties, and of the place wherein he is to perform his work. But in this case Rohan was not working in the place where he was injured, nor was he using the appliance by which he was injured. He was passing through that room by right of, and through the necessity of, his employment. The manner of his employment and scope of his duties were not such as to bring him within the rule governing servants who are using particular appliances in particular places. He had been in that room several times, but sometimes a whole month would pass by, between times, when the pipes in there would not need repairing, while at other times they would need repairing day after day; and upon such occasions as repair was needed, the steam fitter would go in there. Rohan was a new man in the defendant's employ, having only worked at that place for two weeks before the injury, at Nebraska City one month prior thereto, and for two months, prior to going West, he had worked in the Chicago plant.

No ordinary man could familiarize himself with all the lurking dangers of a large packing plant in two months and two weeks time, with an intervening month spent in a distant city, so as to bring him within the rule by implication.

I challenge the counsel to produce a single precedent where the rule has been held to apply under a state of facts parallel, or anywhere near parallel, with the case at bar.

The defendant was bound to furnish him with a reasonably safe passageway from the door to the tank No. 1 upon

that day, and upon any other day when he, of right, traveled there, but while the defendant was not an insurer against obvious dangers, yet it was its duty to see that no hidden, and, to him, unknown, undiscoverable dangers lay in his path. He did not know, and could not discover the temporary danger occasioned by the vat being open in a dark, steaming room, by exercising reasonable care to do so. Whenever he had noticed the vats in use, the warning lights were lit, and when the vats were not in use, the lights were not lit. When he came in there that day, the lights were not lit, but the vat was open, and thereby the usual order of things was reversed, and a new peril, unknown to him, was brought about, by means of which he was injured.

This conduct can not be excused, nor its results be avoided, by pleading the co-servant rule, for there was not the remotest degree of co-association between appellee and O'Donnell.

This case appears to be exactly parallel with McCormick & Co. v. Burandt, 37 Ill. App. 165, and with most of the cases cited by the learned court in the opinion in that case.

In Buhle v. Harland, 37 Ill. App. 350, Buhle's regular place of employment was upon an elevated platform, which he reached by climbing a rude ladder, " several times a day, for a space of three months or more, and knew," etc. In other words, he was injured in his place of employment, through circumstances with which he was " perfectly familiar " for three months or more. Not so in this case. We are astonished that the learned counsel should attempt to make his opinion, in that case, fit the facts in this, but we do not pretend to know the workings of his mind then or now.

So in Glass v. C., R. I. & P. Ry. Co., 41 Ill. App. 87. The engine upon which Glass slipped, was his implement or tool, with which he ought to be " perfectly familiar." Therefore that opinion does not fit the facts in this case. If Glass had been injured by the faulty construction of the switch post, and had been in the employ of the company but a short time, he would have recovered in his case. And in Abbott

v. McCadden, 51 N. W. 1079, the facts are in no particular parallel with this case. Besides, in that case, the court does not say that knowing acquiescence in an illegal practice or custom of an employer, affects the employe's right of action, but that it may do so.

In Michall v. Stanley, 23 At. Rep. 1094, it was the regular duty of the boy to work around, and with, the saw by which he was injured, besides, the defective condition of the saw was to him known for some time. This case is not applicable to the case at bar; nor is the case of Yates v. The J. Co., 69 Md. 370; for the opinion itself assumes an opposite state of facts from the findings of the jury in this case. And in Emma C. O. Co. v. Hale, 19 S. W. 600, the law, as laid down in that case, is fatal to the appellant's cause in this, when applied to the facts herein, for the court say : " On the other hand, the employer takes upon himself an implied obligation to provide the person employed with suitable instruments and means with which to do his work, and to provide a suitable place in which such person, when exercising due care himself, can perform it safely, or without exposure to dangers that do not come within the obvious scope of his employment."

The place where Rohan was injured was not " set apart to him by the masters " in which to perform his duties, nor was it in such condition that, by obvious dangers, he was injured while working there as a steam fitter; for whenever he worked there the room was lighted, and dangers there were apparent to him and were avoided by him. He went in there upon a necessary errand, in the service of his master, and was injured by a latent danger, brought about by the master in removing the cover of the vat and leaving the same unlighted, or insufficiently lighted, which, taken together with the master's reckless disregard of the municipal law, and wilful, reckless negligence in constructing the vats, caused his injury.

MR. JUSTICE WATERMAN. Whether this ordinance enters into and forms a part of the contractual relations that exist

between the owners of and the employes working in packing houses, imposing a duty which, if neglected, may serve as the basis of a personal action for negligence, or merely subjects the employer or owner to such penalties as may be provided for its disobedience, is a question which need not now be discussed.

The ordinance does not prescribe any particular safeguard; the language is "proper safeguards." This must mean proper safeguards with reference to the work to be done. A safeguard might easily be made which would render it impossible for any one to be injured at such vat. Such safeguard might, however, absolutely prevent the performance of work designed to be done. The ordinance must be held to mean a practicable safeguard, such as, while affording reasonable security, does not unreasonably interfere with the work which must be performed. No one will contend that the ordinance requires that work about such vats should be made as safe as is skimming milk.

Appellant contends that by placing the railing around these vats it had complied with the ordinance. Only an expert in the business could tell whether this railing was a proper safeguard or all the safeguard that could reasonably be made use of.

As to this matter there was no evidence; yet the jury were, by the instruction of the court, left free to say that this railing was not such "proper safeguard" as the ordinance of the city required—a matter concerning which the jury can not be presumed to have had any knowledge at all.

It is not claimed that if there were no proper safeguards, the plaintiff was ignorant of the fact. He insists that "proper safeguards," such as the ordinance requires, were not provided; that he knew this all the while, yet kept at work without making complaint of the insecure and "unlawful" condition of the works. Manifestly, he can not now recover damages for any injury caused by a neglect to comply with the ordinance. The case of Wabash, St. Louis & Pacific Ry. Co. v. Thompson, 15 Ill. App. 117, is in this regard quite similar to the present.

It is so well settled as to require no citation of authorities, that an employe can not recover for an injury suffered in the course of the business about which he is employed, on account of defective appliances used therein, when such injury was received after he had a knowledge of the defect and continued his work.   Upon becoming aware of the defective condition of such appliances, he should desist from his employment; but if he does not do so, and chooses to continue, he is deemed to have assumed the risk of such defect, at least when he has not been induced by his employer to believe a change would be made, and has not plainly objected.

The court, by its instruction, utterly disregarded this well known principle.

Taking the plaintiff's testimony, it appears he had complete knowledge as to the location, construction and mode of operating these vats.

We do not understand that this is disputed.   What is contended is, that the plaintiff knew that when the vats were uncovered, it was customary to indicate them by torches and lanterns; that relying upon such custom, he walked into the uncovered vat; that by the absence of torches and lights, a new danger was created, of which he had no knowledge.

The plaintiff's own witness, O'Donnell, testified that at the time of the accident, O'Donnell was skimming the vat; that he had a torch which gave sufficient light for him to work by; that it was the light that had always been used; that his lantern was behind him, and that after the accident he found it in the vault and can not tell whether it was burning at the time the plaintiff fell in or not; that he had a torch and a lantern when he went to work on vat number five.

If it be conceded that there was neither torch nor lantern burning when the plaintiff stepped into the room, the situation then becomes one in which appellee, knowing the dangers of the place, walked into a room dimly lighted by only one dirty window, the steam in the place being such as to

obscure his vision, and then went along in a place where he could not see, and had every reason for knowing that each step was fraught with danger. We do not think that this was doing as an ordinarily prudent man would have done under the same circumstances—in other words, was not an exercise of ordinary care.

The judgment of the Superior Court is reversed and the cause remanded.

*Reversed and remanded.*