[No. 4252.    Decided September 25, 1902.]

ANDREW GREEN, *Appellant,* v. WESTERN AMERICAN COM-
PANY, *Respondent.*

COAL MINING — TIMBER FOR PROPS — DUTY OF OPERATOR TO SUPPLY —
    NEGLIGENCE OF MASTER — ASSUMPTION OF RISK.

Under Bal. Code, § 3178, which provides that the operator of a
coal mine shall supply the workmen therein with timbers suffi-
cient to properly secure the workings from caving in, and these
shall be delivered at the entrance of the working place, a positive
statutory duty is imposed upon the operator of the coal mine, and
where a neglect of such duty proximately contributes to an injury
received by a miner, the operator is liable, even if the miner con-
tinued work after knowledge of the failure to supply the timbers,
since the doctrine of assumption of risk is inapplicable in the face
of the positive injunction of the statute.

SAME — INJURY TO MINER — CONTRIBUTORY NEGLIGENCE.

Whether a miner was guilty of contributory negligence in
working in a crosscut of a coal mine, after the discovery of rock
in the roof of the crosscut, which he could not timber against be-
cause of a failure to supply him with the necessary material
therefor, is a question for the jury, when there was no showing
that the danger was so obvious and imminent that no ordinarily
prudent man would assume the risk.

SAME — EVIDENCE OF GEOLOGICAL FORMATION.

Evidence showing the natural condition of a coal mine, as re-
gards its geological formation, is competent and material in an
action by a miner to recover for injuries received from an acci-
dent therein, for the purpose of establishing his surroundings, the
care necessary to be taken by him, and the care the operator
should take in timbering and operating the mine.

SAME — WITNESSES — EXAMINATION.

The refusal of the court to allow plaintiff on his re-direct ex-
amination to testify as to whether it was rock or coal that fell
upon him was not an abuse of discretion when he had not been
questioned on that point on direct examination.    .

SAME — INCOMPETENCY OF VICE PRINCIPAL — EVIDENCE.

Where the complaint charged as an element of negligence the
employment of an incompetent pit boss, evidence was competent
and material, showing the duties of a pit boss as to inspecting the

working places, keeping the chutes clear of coal, timbering for the purpose of keeping rocks from falling, and repairing defects when complained of; as to the extra hazardous work in unblocking clogged chutes and the selection by the pit boss of inexperienced men therefor; as to the discharge of miners on calling the attention of the boss to the omission to make repairs; as to the general complaint of the inability to get sufficient timbers to properly prop their working places; and as to the general reputation of the pit boss for incompetency and disregard for the lives and limbs of the miners.

SAME — PROOF OF SPECIFIC ACTS.

Specific acts of incompetency of the pit boss were admissible in evidence under the general allegation that he was ignorant and incompetent.

MASTER AND SERVANT — NOTICE OF INCOMPETENCY OF EMPLOYEE.

The master will be presumed to know the incompetency of a pit boss when specific acts of incompetency are shown, of such a nature, character and frequency that the master, in the exercise of due care, must have necessarily had them brought to his notice.

·  Appeal from Superior Court, Pierce County.—HON. WILLIAM O. CHAPMAN, Judge.    Reversed.

*Govnor Teats,* for appellant.

*Fogg & Fogg,* for respondent.

The opinion of the court was delivered by

WHITE, J.—This is an action for personal injury, brought by Andrew Green, a coal miner, against the Western American Company, owner and operator of the Fairfax mines, Pierce county, Washington.    Nonsuit was granted by the court below, and the plaintiff appeals.

There were two general elements of negligence charged in the complaint—the employment of an incompetent pit boss, and the neglect of the defendant to furnish the plaintiff with timbers to properly timber his working place, as provided by § 3178, Bal. Code. The second amended complaint, charging negligence, is as follows:

"That some time prior to the 18th day of September, 1900, the defendant employed the plaintiff to mine coal in . its mines at Fairfax.   After his employment plaintiff set to work driving a crosscut in said mine, which crosscut was to be driven between two chutes for a distance of about 70 feet.    That on or about the — day of ————, plaintiff had driven the said crosscut at a distance of about 25 feet, and then and there requested of the pit boss, John Wilson, for timbers to properly prop the same, and quit work because of the lack of timbers to properly timber the said crosscuts so mined by plaintiff.

"That thereafter the said pit boss caused to be furnished to plaintiff timbers to properly timber and prop said chute for about 20 feet, and the plaintiff proceeded to work, and drove the said crosscut further on towards the chute on the opposite side of the pillar.   That after driving the same a distance of about 18 feet, it became necessary to timber and prop the said crosscut so as to protect plaintiff from falling coal and rock, and there and then requested the pit boss, Wilson, to furnish him with timbers to be used as props to properly secure the workings from caving in; and plaintiff alleges that there was at that time no timbers, or any supply of timbers in said mines to supply the plaintiff at the entrance of his working place, or at any place where plaintiff could obtain the same, as is required by the laws of the state of Washington.   The said Wilson then and there requested the plaintiff to proceed to his working place, stating to the plaintiff that the same was safe and did not need and require timbers to prop, and requested the plaintiff to continue driving the crosscut until it reached the chute on the other side of the pillar, when the defendant would furnish the plaintiff with timber to properly timber and prop the said crosscut.

"That plaintiff then and there went back to his place of work and continued to work until about 1 o'clock on the 18th day of September, 1900, when a rock or block of coal fell, by reason of the lack of timbers and the lack of propping, striking the plaintiff upon his head and back and body, fracturing his spinal column and maiming and wounding him, so that plaintiff became paralyzed from the

pit of his stomach, and the lower portions of the bowels, and all of the muscles and portions of the body, and limbs below the said point so injured, to-wit: the center of the back and the pit of the stomach.

"Plaintiff alleges that it was the duty of the said pit boss, John Wilson, to furnish the said timbers as herein set out for and on the part of the said company for the purpose of making the places reasonably safe as provided by law; that the plaintiff and other miners in the said mine looked to the said pit boss, John Wilson, for the fulfillment of the said duty to the plaintiff and miners in the operation of the said mine.

"Plaintiff alleges that the said pit boss, John Wilson, at the time of his employment and at the time of the accident, was an ignorant, incompetent person, totally unfit to act as foreman or take charge of underground work in a mine. That he had no knowledge of men and no knowledge of mining, and did not know what was necessary to be done in the operation of the said defendant's mine in order to maintain reasonably safe places underground for the men under his charge.. That the said John Wilson was wholly ignorant of the geological formation of the earth and vein in which defendant's mine was located, and did not know what was necessary to be done in order to have and maintain reasonably safe working places under ground for the plaintiff and operators therein. That the said company knew full well that the said John Wilson was so incompetent and irresponsible at the time of the accident to the plaintiff and for a long time before, but that this plaintiff did not know of said character and incompetency of the said John Wilson, and that the injuries of the said plaintiff are due to the negligence and carelessness of the said defendant in employing the said pit boss, and in said defendant's refusing and neglecting to furnish him with the necessary timbers at the entrance of his working place."

Upon these allegations issues were formed, and the cause was tried. At the close of the appellant's testimony a motion for nonsuit was interposed by the respondent, and the motion was sustained. The ruling of the court in this

respect is assigned as error. The evidence discloses that the appellant was a practical and experienced miner. The Fairfax mine consists of three veins, which extend north and south practically, and pitch from sixty to sixty-nine degrees. The entrance is made from the bank of the bluff as it goes out to a river. The coal measures lie about 1,000 feet back from the river, and they run diagonally with the course of the river. The main entry or tunnel starts from the gravel bank near the river, and its main direction is nearly northeast. It is sometimes called east and west by the miners. As one goes into the tunnel, the south would be on the right hand and the north would be on the left of the course. The veins are tapped by a tunnel from beneath, so that when a miner reaches the vein he practically turns around to go up into the working. The following is a diagram of the working:

The chutes running up into the coal number from the entrance of the tunnel north and south. The first chute on the cut to the left is chute 1 north. The chutes to the right are chutes 1 to 4, inclusive, south. At a distance of 30 feet up from the gangway a counter gangway is driven. The chutes reaching the counter gangway are driven practically at right angles with the gangway, and the chutes extending from the counter gangway up into the coal are driven at an angle from the counter gangway of about 40 to 45 degrees, as is necessary in order to work the mine on account of the pitch of the vein. Crosscut No. 5, between chute No. 1 north and chute No. 1 south, counting from the counter gangway, was the place where Green was injured, and was 230 feet from the counter gangway, which would make it about 260 feet from the main gangway up chute 1 south. The chutes are driven from 3 to 5 feet wide and 5 feet high. The difference in the width is due to the thickness of the vein of coal, being driven up through the coal at an angle. The bottom and top of the coal form the two sides of the chutes. The terms for the rock formation, used in the evidence, are the "hanging wall" and the "foot wall." The top and the bottom of chutes and crosscuts were coal. The reason the rock walls were designated the "hanging wall" and the "foot wall" is because of the pitch of the vein. The distance between chutes was generally about 30 feet, but that between chute 1 north and chute 1 south was about 70 feet. The distance between crosscuts was from 30 to 40 feet. The vein of coal pinches out near the surface, and runs into the gravel, which was about 40 feet above the fifth crosscut. As the miners reached the top of the vein, it was found that the coal became softer, and was not solid as below. John Wilson was pit boss. When Green commenced working, he worked in No. 1 vein, called the

"Blacksmith" vein, five days; then went to work in the third vein, and worked in the crosscuts between chute 1 and chute 2 south. While working there, his timbers were packed to him at the entrance of the chutes below at the intersection of the gangway. He was then sent to work driving crosscut No. 3, between 1 north and 1 south, which was about 70 feet through. He drove that through, and also crosscut No. 4, and while driving those through he was instructed to drive clear through first and timber down afterwards, as the timber came from the chutes north, and he got his timbers for those crosscuts through chute 1. The pit boss told him to drive through and timber back, and that is the way he mined and timbered crosscuts 3 and 4. He then proceeded to drive crosscut 5, and drove about 25 feet, when he called for timbers. Receiving none, he quit, laid off two days. This was owing to the coal being more or less soft, and he wanting to timber. The boss then told him to go through crosscut 4, and get his timbers in No. 1 chute north. He did so, and timbered up 20 feet in crosscut No. 5. He then proceeded and mined 18 or 20 feet more. The day before the accident, and after firing a shot, toward evening, he came down to the chute, and met Wilson, and requested of Wilson timbers to timber his crosscut up. Wilson told him that he had ordered the timber packers to bring him timbers, but Green "never got a stick." Wilson went up into the place, and then came down, and repeated that he had told the timber packer to bring the timbers, and requested Green to drive on through the same as he had the other chutes, and to timber back.

"Q. What else did he [Wilson] say? A. 'Well,' he said, 'I told them timber packers to bring you lots of timber, but go ahead and drive it through, and when it comes through up here, timber it up again.' "

Soon after Wilson left, Green went home. In the morning, about a quarter to seven, he went in to work, and met pit boss Wilson at the powder magazine, where it was Wilson's duty to hand out the powder to the men as they needed it for their work in the mine; and then again Green told Wilson that he needed timbers to timber his crosscut, and Wilson told him that he would be up there. Green then went up to his place, and first put up some canvas brattice, which took about one hour. He then went up to pick or mine out the coal loosened by the blast, and, after taking out the heel of the shot, found in the face of his working or crosscut, for the first time, a rock, which took up about half of the space in the face, ran from stone wall to stone wall, and extended down into coal two and a half feet. After digging awhile and discovering the rock, he went down into the old workings, to see if he could not find some timbers, and found nothing but a round piece of canvas stick about three inches in diameter and five feet long. He could not get another timber. He then put the stick under the outer edge of the rock, and drove it in hard. The rock in the face was the first of the kind he had seen in the mine. He inspected the rock in the usual way, examined it very closely to see if there were any cracks, sounded the parts of the rock to see if it was solid, and found the rock was practically solid. He did not see anything very dangerous; did not know it was unsafe. He could not tell what was in the coal back of the face, and did not know of any danger. The following is a part of the cross-examination:

"Q. When did you first encounter this rock? The day you were hurt or before that? A. Yes, sir; the day I was hurt. Q. What time of day? A. What time of day I got hurt? Q. Yes, sir. A. About one o'clock. Q. What I mean is, when did you first come to this

rock in your digging up into the crosscut? When did you first find there was a rock in there? A. I don't remember exactly at this time. Q. Some time during the forenoon? A. I think so. Q. And how long were you at work around that rock, now, before, you quit work there, would you say? A. Not very long. The point on my drill hole extended under that rock a little, and so the coal was soft in there. Q. When did you drill into the coal under this rock, with reference to the time you went down and got the timber? Did you drill in before or after you got this timber? A. I fired that shot the day before. Q. Did you fire any shot the day you were hurt? A. No, sir. Q. Why didn't you? A. I didn't have time. I got hurt too quick. Q. Well, you were there all the forenoon? A. Yes, sir. Q. But you never fire until you go home? A. Hardly. Sometimes you do, but generally you don't. Q. You generally fire the shot in the evening? A. Yes, sir. Q. So that the smoke will have gotten out by the next day after? A. Yes, sir. Q. You say the night before you got hurt the point of your drill struck the rock? A. It never struck the rock. Q. It never struck the rock? A. No, sir. I drilled my hole a foot from the bottom. Q. When did you first know the rock was there? A. I knowed it the same day I was hurt. Q. After you first discovered the rock how long did you keep at work taking coal from under it, would you say? A. Perhaps a couple of hours. Q. Perhaps a couple of hours? A. Yes, sir; perhaps. I cannot remember very well. Q. Now that is the rock that fell on you and hurt you, is it? A. I don't know. I don't think this is the one that broke my back. Q. What do you think about it? A. Well, I know it's not any rock from there that broke my back. I know that. Q. You say the occasion of your quitting finally was that your light became poor? A. Yes, sir. Q. Very often you have to fix up your lamp? A. Yes, sir. Q. And you were going out; were you going to fix your lamp? A. Just away from the face a-ways. Q. You were at work there at the face at the time. A. Yes, sir. Q. There you stepped back, you think, about six feet from the

face? A. Yes, sir; I backed out. Q. What is the first you can recollect that you had of this rock coming on? A. Sir? Q. What did you hear first about this rock falling on you. A. I didn't hear nothing. Q. The first thing you knew you were hit? A. Yes, sir. Q. And you were then about six feet from the face? A. Yes, sir; as near as I can judge. Q. What became of your prop? A. I think the prop is there yet. Q. You think the prop is there yet? A. Yes, sir. Q. Did the prop give way when the rock gave out? A. No, sir. Q. You are pretty positive you were about six feet from the face when you were struck? A. Yes, sir. Q. Now, what happened when you were struck? What effect did it have on you when you were struck? A. It doubled 'me up pretty much. Q. Where were you hit? A. Right across my shoulders. Q. Right across your shoulders? A. Yes, sir. Q. Could you tell how large a rock it was that hit you? A. No, sir. Q. Could you form any estimate about it? Was it a big rock. A. I could not tell. I seen the rock down below. When Mr. Wilson, the pit boss, picked me up he asked me if it was that rock. I told him it might be. Q. What sort of a looking rock was that? A. I cannot remember. Q. How big a rock was that? A. Oh, I couldn't tell. Q. Was it a couple of feet square? A. I could not tell you. Q. Give the jury some idea about how big it was as near as you can tell. A. I seen a corner sticking out of the rock there; perhaps it was a foot long; and the corner pointed like. It was not square; not round. Q. Sort of ragged, jagged looking rock? A. Yes, sir. Q. Well, when this rock struck you on the shoulder did it knock you down? A. Yes, sir. Q. And did you slide then clear down to the chute? A. No, sir. I slid perhaps five or six feet more and then I stopped myself. . . . Q. That would take you about ten or twelve feet from the face? A. Yes, sir; something like that. Q. And then another rock came down? A. Yes, sir, immediately. Q. And pushed you on down to the crosscut? A. Yes, sir. Well, after the second rock struck me I got up because I thought the whole thing was going to fall

so that I made my last struggle and got up on my feet. Q. Now, tell the jury—explain to the jury how you were lying or sitting after you slid down here three or four or five feet after the first rock hit you. A. I was lying very much cross ways as I remember, when the second rock struck me. Q. With your face down to the floor of the crosscut? A. No, sir. My face towards the hanging wall and my feet towards the foot wall. Q. Was your head more up towards the face of the entry than down towards the chute? A. I think it was. Q. And the second rock slid down the crosscut and struck you on the small of the back? A. I think it dropped down. Q. You think it dropped down and struck you in the small of the back? A. Yes, sir. Q. Do you know whether it dropped down or slid down? A. I could not hear nothing sliding. Q. So that it must have dropped? A. Yes, sir. Q. Could you hear it when it left, wherever it started from? A. No, sir. Q. You have no recollection of that? A. No, sir. . . . Q. What had become of the two rocks that hit you? Had they gone down the crosscut or were they still against you? A. I could not tell you. One of them slid down. Q. Before you went down? A. I could not tell. . . . Q. You have not a very distinct recollection of what took place? A. I remember very well, but I was mostly delirious."

There was testimony tending to show that "niggerheads" falling from the roof would give no warning. The cause of appellant's lamp getting out of order was that it struck against the damp surface of the rock he was working under. The chute from below his crosscut was almost filled with coal, which was the only thing that prevented him from going down the chute the entire distance of 230 feet. The purpose of timbering is to protect the roof from caving and the miners from being injured, and niggerheads from falling out of the coal unexpectedly. It was the company's duty to furnish the timbers at the entrance of appellant's crosscut No. 5, just above it, so the coal

would not strike it as it went out of his crosscut. There was no custom in this mine and no rule as to timbering. There were no timbers near crosscut No. 5, and no timbers were furnished Green, as he had requested. There is always more or less danger in a mine, and sometimes one may think himself safe when he is not. It was the duty of the pit boss to inspect the mine and the places; to inspect for falling rock, and to clear the chutes of coal; to see that the timbers and props were delivered to plaintiff and the other miners. Miners do their own timbering. That is part of their contract, and they receive no pay for it. It is as cheap for them to timber first as last. Appellant testified that, if he had had timbers, he would have kept his place well timbered to the face; would have put up his timbers every day, especially in this crosscut, as the coal was soft, and more likely to fall. But he had confidence in the pit boss and in his experience, and thought he would be safe in mining there as requested by the pit boss. He did·not stop and go home because the pit boss told him to go through. As he states: "I didn't think it was dangerous. If I had thought it would be dangerous, and I get hurt this way, do you think for a moment that I would stay there and get hurt? No, never." Whether it is safe or not to mine without timbers depends upon conditions. In mining coal the miners quite frequently come across places such as Green found in the face. It would have been safe for Green to do just as he did with a flat rock—after tapping, and finding it to be solid, to proceed to work. A flat rock will disclose breaks or other dangers by the tapping or sounding. It was not carelessness for Green to work around the rock as he did until the boss should come as he promised. The danger was not so imminent and immediate, under all the conditions, in crosscut 5, but what a reasonably careful man

would have done just as Green did.  A man could work seven weeks if a rock was solid.  A portion of the testimony relative to the furnishing of timbers was as follows:

"Q.   Tell how you happened to get them up in there. A.   The mining boss told me to drive through there and timber down through there for this crosscut.   Q.   Did you have any conversation with the mining boss about that? A.   Yes, sir.   Q.   Tell the jury about it.   A.   He told me to timber up after I drove through. . . .   He [Wilson] said:   'I told the timber packers to bring you up some timber,' and I never had a stick. . . .   And he said, 'I told them timber packers to bring you lots of timber,' but I didn't have none, not one. . . .   Q. Were there any timbers anywhere near crosscut No. 5 at the place you got hurt?   A.   No, sir; there was not.   Q. What talk did you have with him?   A.   I told him we needed some timbers. . . .   He said, 'I will be up there.' "

Appellant testified that the timbers should be delivered at the entrance of the crosscut where one was working; that he applied to Wilson down in the gangway for timbers on the morning of the accident, and complained that he had no timbers.

"A.   After I had gone into that rock about a foot I went down into the old works and knocked out an old timber and put that under the rock, that flat rock. . . .   Q. Did you take with you more than one timber?   A.   No, sir; I could not get hold of any more timbers.   I brought some laggings with me from this chute up there. . . . I asked him for timbers, and always requested for timber. . . .   Well, I done all I could.   I went and knocked out my own timber and put it out.   I could not do any more. . . .   It was the best thing I could get and I think it was plenty strong enough to hold that flat rock. . . .   Q.   When you drive you call for timbers? A.   Yes,   sir.   Q.   Were   they   furnished   you?   A. Sometimes they were, and most of the time they were not. . . .   Q.   Now, I want to ask you about the

timbers, Mr. Green.    Is it not true that there were tim-
bers, three or four timbers, right near the bottom of your
crosscut?    A.    No, there was not.    Q.    And did you
crawl over those timbers after you slid or was thrown down
your crosscut?    A.    No, sir.    Q.    And did not your din-
ner pail hang right over or nearly over those perpendicular
timbers?    A.    There were no timbers there except that
old canvas stick I brought up chuck full of nails, and they
hurt me awfully, but I could not get them out.    Q.    When
you went to get your lunch, didn't you sit on timber right
at the bottom of your crosscut to eat your lunch?    A.
No, sir; I had no timbers there; I could not sit on no tim-
bers.    Q.    And were there not plenty of timbers, say, at
the lower entrance of crosscut No. 4?    A.    No, sir; and if
there had been I could not have got them; but there were
none there.    Q.    How do you know?    A.    Because I took
the last and put them up there.    Q.    When?    A.    When
I timbered up.    Q.    When?    How many days before you
were hurt?    A.    About two days and a half.    Q.    About
two days and a half?    A.    Yes, sir.    Q.    And did you
not know whether timbers had been delivered below there
in the meantime or not?    A.    No, sir; I didn't know, but
I didn't think so, because I could not get them, and the
mining boss told me to drive through and get more tim-
bers.    Q.    When were you down here at that place?    A.
I was down there two and a half days before I got hurt.
Q.    You were not there afterwards?    A.    After I got
hurt?    Q.    You were nòt there after two days before?
A.    No, sir.    Q.    And whether the timbers were deliv-
ered there at that time or not you do not know?    A.    No,
sir.    Q.    Why didn't you go and see?    A.    How can I
go when there was a six or seven inch opening there?
When I got the timbers before, I had to buck the coal
down; it took me a long time to buck the coal down; I had
to creep on my back and take the timbers in that way."

"The owner, agent or operator of any coal mine shall
keep a sufficient supply of timber at any such mine where
the same is required for use as props, so that the workmen
may at all times be able to properly secure the said work-

ings from caving in, and it shall be the duty of the owner, agent, or operator to send down into the mine all such props when required, the same to be delivered at the entrance of the working place." Bal. Code, § 3178.

Under this section the operator of a coal mine is required to keep a sufficient supply of timber to be used as props, so that the workman, needing the timber to properly secure his work from caving in, shall have it at hand. The operator must not only keep the timber for that purpose, but he must send it down into the mine, and deliver it at the entrance of the working place. The evidence tends to show that the entrance to the particular working place in which the appellant was working was the upper side of chute No. 1 south, where crosscut 5 intersected said chute, and under the law this is the place at which the props should have been delivered. This regulation is a wise one, and the court should endeavor to uphold it by all reasonable construction. The purpose of the law is to provide a reasonably safe place for the men to work in, and that the working places mined out where the men are compelled to go or work shall be timbered by the men as they mine the coal away, so as to keep the same from caving in, and to make it reasonably safe from the inherent dangers. The falling of rock and coal is one of the inherent dangers that produces a large percentage of all the accidents, and this law was passed for the purpose of reducing the number of accidents as far as possible. It is a positive duty imposed upon the operator, and for a neglect of this duty, which proximately contributed to the injury, the company is responsible. The general duty imposed by law upon the master is to provide a suitable and reasonable place for the doing of the work to be performed by the servants, and an adequate supply of sound and safe materials, implements, and accommodations, with such other appliances as may

reasonably be required to insure their safety while at work. When the statute prescribes the measures that shall be taken by the operator of a coal mine to render the place safe where the miner is working, it imposes a specific duty upon the master, which he must perform to escape the charge of negligence.    The law has regard to the hazardous nature of the employment in imposing this duty upon the operator of the mine, the object being to secure a reasonably safe place for the workmen in the mine.    The test and measure of duty is the command of the statute. *Sommer v. Carbon Hill Coal Co.*, 89 Fed. 54 (32 C. C. A. 156).    The general duty is also imposed upon the operator to see that the working places in the mine where props are necessary to keep the mine from caving in are propped, and that the working places are frequently inspected to ascertain whether the props are put up; and to see that the workmen put up the props as their work progresses.    A failure to do this is negligence.    To do this is the exercise of a reasonable precaution, and reasonable precautions must be taken to secure the safety of the workmen.    The workmen have a right to look to the master for a discharge of this duty.    Failure to take such precaution is negligence.    *Costa v. Pacific Coal Co.*, 26 Wash. 138 (66 Pac. 398); *Shannon v. Consol. Tiger & Poorman Min. Co.*, 24 Wash. 119 (64 Pac. 169).

If the statute as to furnishing props had been complied with, would the injury have occurred?    From the evidence it is fair to presume that, if the props had been furnished, the place where the appellant was injured, some twelve feet from the rock he was digging under, which was exposed by the blast set off the evening before, would have been roofed over.    There is evidence tending to show that the rock that injured him fell out of the roof, and that he did not know of its presence in the roof.    If he was

injured by a rock or block of coal falling from the roof, that would have been timbered if the company had performed its duty, then the danger was one of the risks of his place contemplated in the law.    The rock did not fall because of any act of Green, but it fell through the lack of props—the violation of the law by the company.    It can-not be said that appellant should have left the place because the danger was imminent, for the evidence tends to show that he did as other miners have and would have done, and acted in the practical and customary way; that he was requested by the pit boss to drive on through to the other side, and timber back; and if the jury should find such assurance was made, and the danger was not so imminent but what a reasonably careful man would do as appellant did, then he was not guilty of negligence in proceeding as he did.    He did not know the exact danger in the roof, and, if the rock fell from the roof, he did nothing to bring it down upon him.

In passing upon a statute of Indiana similar to the one under consideration, in *Harder, etc., Min. Co. v. Schmidt*, 104 Fed. 282 (43 C. C. A. 532), the court said at page 285:

"Whatever may be the exemption of the employer from liability for injuries caused by a danger that is obvious to the injured, such exemption will not be accorded where the nature of the menace is so uncertain as to cause discussion between the employees and the employer, with the result that the employer dissuades the employee of his apprehension;    .   .   ."

In *Gundlach v. Schott*, 192 Ill. 509 (61 N. E. 332, 85 Am. St. Rep. 348), it was held:

"It is well settled that, even though the plaintiff knew of the defect, if the master ordered him to proceed with the dangerous work he did not assume the risk of so doing, unless the danger was so manifest that a person of ordin-

ary prudence and caution would not have incurred it. 'Even if the servant has some knowledge of attendant danger, his right of recovery will not be defeated, if, in obeying the order, he acts with the degree of prudence which an ordinarily prudent man would exercise under the circumstances.   When the master orders the servant to perform his work the latter has a right to assume that the former, with his superior knowledge of the facts, would not expose him to unnecessary perils.   The servant has a right to rest upon the assurance that there is no danger, which is implied by such an order.   The master and servant are not altogether upon a footing of equality.   The primary duty of the latter is obedience, and he cannot be charged with negligence in obeying an order of the master unless he acts recklessly in so obeying.   Whether he acted thus recklessly in obeying his master's order, or whether he acted as a reasonably prudent person should act, are questions of fact to be determined by the jury.'   *Illinois Steel Co. v. Schymanowski,* 162 Ill. 447 (44 N. E. 876); *Offut v. World's Columbian Exposition,* 175 Ill. 472 (51 N. E. 651)."

See, also, *Myrberg v. Baltimore, etc., Reduction Co.,* 25 Wash. 364 (69 Pac. 539).

It is true that the appellant was a practical miner.   He knew there was danger of falling rock from the unroofed crosscut.   He knew the coal was soft.   Under ordinary circumstances, without assurance from his employer and obedience to his employer's order, he might be said to have assumed the risk of the injury that overtook him.   Does the statute we have cited change the ordinary rule?   We think it does.   While it is the ordinary rule that the workman assumes the known dangers resulting from negligence of the positive common-law duty on the part of his employer when he continues at work, that rule of law cannot apply to the violation of a statutory duty.   Where the operator of a coal mine violates a statute providing for the furnishing of timbers, for instance, and one is injured

through the fact of the violation by reason of the lack of timbers which should have been furnished, the employer cannot plead assumption of risk, etc., even when the miner knew of the violation. The operator cannot violate a statutory command made for the protection of workmen, and shift his responsibility and liability upon the injured on the plea that the injured one knew the law was violated; especially so when the injured one was doing all in his power before the accident to have his employer obey the law by furnishing the timbers. If this were not so, the law would be a dead letter. The primary object of the statute is to secure the safety of persons employed in coal mines. To apply the doctrine of assumption of risks to the case under consideration would render the law ineffectual to accomplish the object that it was intended should be accomplished by it.

"Every person, while violating an express statute, is a wrongdoer, and is *ex necessitate* negligent in the eyes of the law; and an innocent person within its protection, injured thereby, is entitled to civil remedy by way of damages. *Dodge v. Railroad Co.,* 34 Iowa, 276; *Correll v. Railway Co.,* 38 Iowa, 124; *Small v. Railway Co.,* 50 Iowa, 338." *Mossgrove v. Zimbleman Coal Co.,* 110 Iowa, 169 (81 N. W. 227).

In *Narramore v. Cleveland, etc., Ry. Co.,* 96 Fed. 298 (48 L. R. A. 68), in passing upon a statute of Ohio requiring railroad companies to block the frogs, switches, and guard rails on their track under a penalty of a fine, the court of appeals of the sixth circuit said:

"The sole question in the case is whether the statute requiring defendant railway, on penalty of a fine, to block its guard rails and frogs, changes the rule of liability of the defendant, and relieves the plaintiff from the effect of the assumption of risk which would otherwise be implied against him. We have already had occasion to consider in

a more or less direct way the effect of the statute.    *Railway Co. v. Van Horne,* 16 C. C. A. 182, 69 Fed. 139; *Railway Co. v. Craig,* 19 C. C. A. 631, 73 Fed. 642.    In these cases we held that the failure on the part of a railway company to comply with the statute was negligence *per se.* A further consideration of the statute confirms our view. The intention of the legislature of Ohio was to protect the employees of railways from injury from a very frequent source of danger by compelling the railway companies to adopt a well-known safety device.    It was passed in pursuance of the police power of the state, and it expressly provided, as one mode of enforcing it, for a criminal prosecution of the delinquent companies.    The expression of one mode of enforcing it did not exclude the operation of another, and in many respects more efficacious, means of compelling compliance with its terms, to-wit, the right of civil action against a delinquent railway company by one of the class sought to be protected by the statute for injury caused by a failure to comply with its requirements.    Unless it is to be inferred from the whole purview of the act that it was the legislative intention that the only remedy for breach of the statutory duty imposed should be the proceeding by fine, it follows that upon proof of a breach of that duty by the railway company, and injury thereby occasioned to the employee, a cause of action is established. *Groves v. Lord Wimborne* (1898) 2 Q. B. 402, 407; *Atkinson v. Waterworks Co.,* 2 Exch. Div. 441; *Gorris v. Scott,* L. R. 9 Exch. 125.    In this case there can be no doubt that the act was passed to secure protection and a newly-defined right to the employee.    To confine the remedy to a criminal proceeding in which the fine to be imposed on conviction was not even payable to the injured employee or to one complaining, would make the law not much more than a dead letter.    The case of *Groves v. Lord Wimborne* involved the construction of a statute quite like the one at bar, and a right of action was held to be given thereby to the injured servant in addition to the criminal prosecution.    The courts of Ohio have given the statute under discussion the same construction.    *Railroad Co. v. Lambright,* 5 Ohio Cir. Ct. R. 433, affirmed by the su-

preme court of Ohio without opinion, 29 Wkly. Law Bul. 359.

"Do a knowledge on the part of the employee that the company is violating the statute, and his continuance in the service thereafter without complaint, constitute such an assumption of the risk as to prevent recovery? The answer to this question is to be found in a consideration of the principles upon which the doctrine of the assumption of risk rests. If one employs his servant to mend and strengthen a defective staircase in a church steeple, and in the course of the employment part of the staircase gives way, and the servant is injured or killed, it would hardly be claimed that the master was wanting in care towards the servant in not having the staircase which fell in a safe condition. Why not? Because, even if no express communication is had upon the subject, the servant must know, and the master must intend, that the dangers necessarily incident to the employment are to be at the risk of the servant, who may be presumed to receive greater compensation for the work on account of the risk. The foregoing is an extreme case, perhaps, but it fairly illustrates the principle of assumption of risk in the relation of master and servant. Assumption of risk is a term of the contract of employment, express or implied from the circumstances of the employment, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty shall be at the servant's risk. In such cases the acquiescence of the servant in the conduct of the master does not defeat a right of action on the ground that the servant causes or contributes to cause the injury to himself; but the current statement is that no right of action arises in favor of the servant at all, for, under the terms of the employment, the master violates no legal duty to the servant in failing to protect him from dangers, the risk of which he agreed expressly or impliedly to assume. The master is not, therefore, guilty of actionable negligence towards the servant. This is the most reasonable explanation of the doctrine of assumption of risk, and is well supported by the judgments of Lord Justices Bowen and Fry in the case of *Thomas v. Quartermaine,* 18 Q. B. Div.

685, 695.   See, also, language of Lord Watson in *Smith v. Baker* (1891) App. Cas. 325, and *O'Maley v. Gaslight Co.,* 158 Mass. 135, 32 N. E. 1119.   It makes logical that most frequent exception to the application of doctrine by which the employee who notifies his master of a defect in the machinery or place of work, and remains in the service on a promise of repair, has a right of action if injury results from the defect while he is waiting for the repair of the defect, and has reasonable ground to expect it.   *Hough v. Railway Co.,* 100 U. S. 213 ; *Railroad Co. v. Babcock,* 154 U. S. 190, 14 Sup. Ct. 978 ; *Snow v. Railway Co.,* 8 Allen, 441 ; *Gardner v. Railroad Co.,* 150 U. S. 349, 14 Sup. Ct. 140.   From the notice and the promise is properly implied the agreement by the master that he will assume the risk of injury pending the making of the repair.   If, then, the doctrine of the assumption of risk really rests upon contract, the only question remaining is whether the courts will enforce or recognize as against a servant an agreement express or implied on his part to waive the performance of a statutory duty of the master imposed for the protection of the servant, and in the interest of the public, and enforceable by criminal prosecution.   We do not think they will.   To do so would be to nullify the object of the statute.   The only ground for passing such a statute is found in the inequality of terms upon which the railway company and its servants deal in regard to the dangers of their employment.   The manifest legislative purpose was to protect the servant by positive law, because he had not previously shown himself capable of protecting himself by contract; and it would entirely defeat this purpose thus to permit the servant 'to contract the master out' of the statute.   It would certainly be novel for a court to recognize as valid an agreement between two persons that one should violate a criminal statute; and yet, if the assumption of risk is the term of a contract, then the application of it in the case at bar is to do just that."

We do not think, in consideration of the statute cited, that the appellant assumed the risk of his employment in

this instance.  The assumption of risk by the employee, which is a matter of contract, is not to be confused with contributory negligence.

"Assumption of risk and contributory negligence approximate where the danger is so obvious and imminent that no ordinarily prudent man would assume the risk of injury therefrom.  But where the danger, though present and appreciated, is one which many men are in the habit of assuming, and which prudent men who must earn a living are willing to assume for extra compensation, one who assumes the risk cannot be said to be guilty of contributory negligence if, having in view the risk of danger assumed, he uses care reasonably commensurate with the risk to avoid injurious consequences.  One who does not use such care, and who, by reason thereof, suffers injury, is guilty of contributory negligence, and cannot recover, because he, and not the master, causes the injury, or because they jointly cause it.  Many authorities hold that contributory negligence is a defense to an action founded on a violation of statutory duty, and this undoubtedly is the proper view."  *Narramore v. Cleveland, etc., Ry. Co., supra.*

It was for the jury to say whether or not the appellant used reasonable care in working in the crosscut after the discovery of the rock, because we cannot say the danger was so obvious and imminent that no ordinarily prudent man would assume the risk of injury.  *Jordan v. Seattle,* 26 Wash. 61 (66 Pac. 114).

From what we have said it follows that the judgment of the court must be reversed, and this case remanded for a new trial.  Some of the errors assigned may arise during the progress of the new trial and it becomes necessary for us to pass upon them.  The following questions were asked by the appellant, objected to by the respondent as incompetent, irrelevant and immaterial, and objection sustained:

"What is a jump?"

"Is it not a fact, Mr. Puthoff, that in the geological change from a horizontal to an almost perpendicular that where the coal is pinched out as shown by plaintiff's identification No. 2 here, that in that vicinity and for a number of feet below there is a change, and as you reach that gravel —for 100 feet—and as you reach that gravel is there a changed condition in the coal from hard to soft?"

"Would there be any similarity between the coal formation at the place where you drove; that is, between 1 and 2 and No. 5 crosscut, where Green was hurt?"

"How far from the gravel did you drive the crosscut or air way between 1 and 2 south?"

"The condition—a coal vein changes, does it, as to location and place? Answer: Yes, sir. Question: What changes the condition of coal near the gravel, or near a fault?"

All of these questions tended to show the natural condition of the mine in which the appellant was working, his surroundings, the care necessary to be taken by the workmen in working in the mine, as well as the care the company should take in timbering and operating the mine. The condition of the mine in the vicinity of the accident is an important matter for the consideration of the jury. We think all of these questions were competent and material, and that the court erred in sustaining the objections thereto.

The following question was asked the appellant: "What did you say, whether it was rock or coal that fell on you?" This question was competent, but it was not asked on the direct examination of Mr. Green, and the objection to it was that it was incompetent, and was not redirect examination. The last objection was well taken, but it was within the discretion of the court to have allowed the question. We cannot say that the court abused its discretion in refusing to allow it. The following question was asked:

"Whereabouts did you get your timbers when you were working on those angles on the south side?" This was objected to because it was incompetent, irrelevant and immaterial. In some phases of the case this question might have been material. The answer to this might have a tendency to show that it was not the rule in the mine to furnish the timbers at the entrance to the working place, as required by statute. The following questions were asked, objected to, and objection sustained:

"Men in the mine driving chutes are generally paid how?"

"You may state whether or not miners in this particular mine,—in this portion of the mine,—how they worked; whether by contract work, or how they worked."

These questions were objected to as incompetent, irrelevant, and immaterial. If this evidence was material, it was for the purpose of showing the manner of operating the mine. It might have been material for that purpose. If, however, no other errors were assigned, we would not reverse the case on account of the rulings of the court in this particular. The following questions were asked, objected to as incompetent, and objection sustained:

"You may tell the jury what are the duties of a pit boss as to inspecting the working places."

"Mr. Puthoff, you may state what the duties of a pit boss are in relation to keeping the chutes clear of coal."

"You may state, Mr. Puthoff, what the duties of a pit boss are in relation to timbering or fixing the bulkheads for the purpose of keeping rocks from falling down through the chutes."

"You may state, Mr. Puthoff, the duties of a pit boss in relation to repairing defects when complained of."

"You may state, Mr. Puthoff, whether or not when chutes become clogged or blocked, it is extra hazardous work to start them and unblock them."

"You may state if you watched the conduct of the pit boss, John Wilson, while you were at work in the mines."

"You may state, Mr. Puthoff, whether or not it was the general complaint in the mine among the men, the miners, to the foreman or the pit boss that they had not sufficient amount of timbers and props at the entrance of their working place to properly timber their places."

We think all these questions were competent, as tending to show the incompetency of the pit boss to superintend the workings in the mine.    We think that under the complaint the appellant had the right to show the incompetency of the pit boss, and that the court was not justified in excluding the testimony, which these questions sought to bring out, tending to show such incompetency.    For the same reasons we think the appellant should have been allowed to show that it was the duty of the pit boss to see that the coal in the chutes was removed, so that the travel ways or air ways were cleared, and that the pit boss did not perform that duty.    The appellant should also have been allowed to show that it was the duty of the pit boss to timber the chutes and crosscuts, and to place bulkheads and other devices for the purpose of keeping rock and coal from running down the chutes; that the pit boss, John Wilson, did not, in the management of the mine, place bulkheads or timbers for the protection of the chutes or crosscuts so as to keep rock from falling down through the chutes, and that by reason of his negligence and neglect of that duty rocks were constantly falling down through the chutes and crosscuts, making it dangerous to miners. The appellant should also have been allowed to show that it was the duty of the pit boss to repair defects in bulkheads and other devices when made, so that the coal above being mined by the miners would not fall on the miners below; that the pit boss did not make such repairs, and, when in-

8-30 WASH.

formed of such defects by the miners below, the miners were immediately discharged; that the pit boss would employ ignorant, inexperienced miners, and would set them at hazardous work in the mine, without informing them of the danger and hazard of such employment, and, instead of informing them of the dangers, would assure them that it was not dangerous. Appellant should have been allowed to show that, when the chutes in the mine became blocked, and starting or unblocking the chutes was dangerous work, the pit boss sent ignorant and inexperienced men to start the chutes, and told them there was no danger. We think appellant should have been allowed to show that it was the general complaint in the respondent's mine that the workmen did not have and could not get a sufficient amount of props and timbers, that they were not delivered to them at the entrance of the working places, and that there was not a sufficient amount of timber to properly prop their working places for the protection of the lives and limbs of the men. Evidence under these offers would have had a tendency to establish the incompetency of the pit boss. It was also competent for the appellant to show that the respondent could, by reasonable care, have known of the incompetency of the pit boss, and of his want of proper supervision over the workmen and the working places in the mine. We think it was also competent to show the general reputation of the pit boss for competency and regard for the lives and limbs of the miners under his charge. The functions and duties of the pit boss made him, under the law, a most important vice principal. The duty of selecting a competent pit boss was as imperative as the duty to furnish proper timbers and props. It will not do, in this sort of a case, to take the narrow view seemingly taken by the court below, that, if the law has been violated, it is immaterial what kind of a vice principal vio-

lated the law, and hence to exclude all evidence of his incompetency. That would be, in substance, telling the operator of a mine, "You may appoint incompetent persons, and place them in charge of the lives of the men you have under ground, and if, by chance, some person is injured because of the violation of a statutory duty, the fact of such an appointment will never be allowed to go to the jury on the matter of your diligence and care for the safety of the men under your charge." A competent pit boss must understand not only the statutory duties imposed upon the operator by law, but the ordinary duties appertaining to such a position.

"The presumption is that the master has exercised proper care in the selection of the servant. It is incumbent upon the party charging negligence in this respect to show it by proper evidence. This may be done by showing specific acts of incompetency, and bringing them home to the knowledge of the master or company; or by showing them to be of such a nature, character and frequency that the master, in the exercise of due care, must have had them brought to his notice. But such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of. So it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of a servant, to leave it to the jury to determine whether they did come to the knowledge of the master, or would have come to his knowledge if he had exercised ordinary care. In such case the presumption that the master had discharged his duty may be overcome to such an extent as to call upon him to rebut the proof made showing his negligence." Bailey, Master's Liabilities for Injuries to Servant, p. 55, and cases cited.

See, also, *Baltimore & O. R. R. Co. v. Henthorne*, 73 Fed. 634 (19 C. C. A. 623); *Davis v. Detroit & M. R. R. Co.*, 20 Mich. 105 (4 Am. Rep. 364) *Hilts v. Chicago & G. T. Ry. Co.*, 55 Mich. 437 (21 N. W. 878); *Gilman*

*v. Eastern R. R. Corporation,* 10 Allen, 233 (87 Am. Dec. 635); *Gilman v. Eastern R. R. Co.,* 13 Allen, 433 (90 Am. Dec. 210); *Chicago & A. R. R. Co. v. Sullivan,* 63 Ill. 293; *Western Stone Co. v. Whalen,* 151 Ill. 472 (38 N. E. 241, 42 Am. St. Rep. 244); *Driscoll v. City of Fall River,* 163 Mass. 105 (39 N. E. 1003); *Norfolk & W. R. R. Co. v. Hoover,* 79 Md. 253 (29 Atl. 994, 25 L. R. A. 710, 47 Am. St. Rep. 392); *Pittsburgh, etc., Ry. Co. v. Ruby,* 38 Ind. 294 (10 Am. Rep. 111).

Specific acts of incompetency of the pit boss were admissible in evidence under the general allegation that the pit boss was ignorant and incompetent, and under this allegation evidence was admissible that the pit boss did not have regard for the lives of the men under his charge, etc. The matter stricken from the complaint was evidentiary matter, and for that reason the court did not err in striking the same, so long as there remained the general allegation that the pit boss was ignorant and incompetent.

The judgment of the court below is reversed, and the cause remanded for a new trial.

REAVIS, C.J., and DUNBAR, HADLEY, FULLERTON, ANDERS and MOUNT, JJ. concur.