(No. 5471.   Decided August 2, 1905.)

R. B. HALL, *Respondent,* v. WEST & SLADE MILL COMPANY, *Appellant.*[1]

MASTER AND SERVANT — NEGLIGENCE — VIOLATION OF STATUTORY DUTY—GUARDING MACHINERY—ASSUMPTION OF RISK. The defense of assumption of risk is not available to a master where the servant is injured by reason of the master's failing to comply with the factory act, Laws 1903, p. 40, requiring operators of mills to place safeguards over cogs, gearings, and shaftings that can be properly safeguarded (ROOT, RUDKIN and CROW, JJ., dissenting).

SAME — CONTRIBUTORY NEGLIGENCE — SERVANT MOMENTARILY FORGETTING UNGUARDED SET SCREW. A mill hand whose duty required him to constantly work about a shafting and who had knowledge of an unguarded set screw therein, is not guilty of contributory negligence in coming in contact with such set screw, in a moment of forgetfulness while lifting a heavy timber, where he did not assume the risk of injury therefrom, by reason of the fact that the master had failed to comply with the factory act requiring such shafting to be guarded.

Appeal from a judgment of the superior court for Chehalis county, Irwin, J., entered July 7, 1904, upon the ver-

[1] Reported in 81 Pac. 915.

dict of a jury, rendered in favor of the plaintiff, in an action for personal injuries sustained by an employee in a mill, through coming in contact with a set screw upon a revolving shaft. Affirmed.

*J. B. Bridges,* for appellant.
*Govnor Teats,* for respondent.

FULLERTON, J.—The respondent was injured while employed in the lumber mill of the appellant, and brought this action to recover therefor. He was successful in the court below, and this appeal is from the judgment entered in his favor.

In the lumber mill in question were two parallel lines of rollers, located about four feet apart, extending almost the entire length of the mill. One set of these, called dead rollers, led from the back of the gang edger, and received such timber products as were passed through that machine. The other set were called live rollers, being kept in motion, when in use, by the motive power used to operate the mill. The device used to connect the rollers with the motive power was an ordinary steel shaft, with cogwheels and pinions, which extended the entire length of the line of rollers; the same being fastened to the frame work in which the rollers operated on that side next to the dead rollers before mentioned. The shaft was not one continuous piece, but was made up of several sections connected together by means of iron bands or collars, held in place by set screws. The shaft, cogwheels, pinions, collars and set screws were left uncovered and exposed.

The respondent was required to work between the two lines of rollers. A part of his duty was to take that part of the timber products passing through the gang edger which was suitable only for laths or wood and throw it over the live rollers to the gang saws, which were located on the opposite side of the same. While performing these duties on

the morning of the 21st of August, 1903, the respondent's clothing caught on a set screw, which had been allowed to project from three-fourths of an inch to an inch from one of the collars used to splice the shaft, and wound around the shaft, drawing the respondent down upon it, and between it and the frame work which held the rollers, breaking his arm between the elbow and shoulder, breaking his collar bone, and crushing and maiming the bones of his shoulder, leaving him a permanent cripple.

To a complaint embodying the foregoing facts, the appellant answered, and, after making certain denials and admissions, set forth that the respondent had actual notice and knowledge, for some two weeks before he was injured, that the shafting on which he was injured was in an uncovered and exposed condition, and that the set screw which caught his clothing projected from the collar, and knew, also, of the dangers incident to working in such an exposed place; averring that he not only assumed the risk of working in that place, but was guilty of contributory negligence in so doing. To the defense of assumed risk, a demurrer was interposed, and sustained by the court on the ground that the appellant had not complied with the act of March 6, 1903 (Laws 1903, p. 40), which requires all operators of mills and workshops to place safeguards over all such cogs, gearings, shaftings, and the like, that can be properly safeguarded, before putting the same into use.

On the trial the respondent admitted, on cross-examination, that he knew for some time prior to receiving his injury, of the unguarded machinery, and of the fact that the set screw on which his clothing caught projected from the collar for a considerable distance; testifying also that he knew that if it caught his clothing it was liable to injure him, and that he came against it in a moment of forgetfulness while handling a heavy piece of timber. A motion for nonsuit was interposed at the conclusion of the respond-

ent's case to the jury, which the trial judge overruled. The judge also refused to instruct the jury to find for the appellant on the ground that the respondent had assumed the risk, but instructed them to the effect that the appellant could not claim the benefit of the common law doctrine of assumed risk, for the reason that the appellant had not safeguarded the shafting on which the respondent was injured, as it was required to do by the mandate of the statute above cited.

The several rulings of the trial court to the effect that the defense of assumption of risk was not available to the appellant, as against the respondent's cause of action, constitute the first error assigned, and it is to this question that the arguments of counsel are mainly directed. The rule as announced by the trial court is in accord with the decision of this court in the case of *Green v. Western American Co.,* 30 Wash. 87, 70 Pac. 310, and unless that case is to be overruled, it is controlling on the question here. The appellant urges that it should be overruled, contending that it is neither supported by the better reasoning nor by the weight of authority. But after further consideration, we are not convinced that the case is unsound in principle, or that it violates any rule of public policy. It is not necessary here, however, to state the reasons on which the decision rests. This is ably done by the judge who announced the opinion in the case, and by the distinguished judge from whom he so lengthily quoted. But we do not wish to be understood as conceding that the case is without authority in its support. While it may be true, as the appellant contends, that the weight of authority is against it, yet we find it supported by courts respectable in numbers as well as in ability. In addition to those cited in the case itself, the following may be consulted: *Monteith v. Kokomo Wood Enameling Co.,* 159 Ind. 149, 64 N. E. 610, 58 L. R. A. 944; *Sipes v. Michigan Starch Co.* (Mich.), 100 N. W. 447; *Davis Coal Co. v. Polland,* 158 Ind. 607, 62 N. E. 492, 92 Am. St. 319; *Litchfield*

*Coal Co. v. Taylor,* 81 Ill. 590; *Catlett v. Young,* 143 Ill. 74, 32 N. E. 447; *Durant v. Lexington Coal Min. Co.,* 97 Mo. 62, 10 S. W. 484; *Landgraf v. Kuh,* 188 Ill. 484, 59 N. E. 501; *Lore v. American Mfg. Co.,* 160 Mo. 608, 61 S. W. 678; *Henderson v. Kansas City,* 177 Mo. 477, 76 S. W. 1045; *Greenlee v. Southern R. Co.,* 122 N. C. 977, 30 S. E. 115, 65 Am. St. 734, 41 L. R. A. 399; *Kilpatrick v. Grand Trunk R. Co.,* 74 Vt. 288, 52 Atl. 531, 93 Am. St. 887. In some of the cases above cited, particularly those from the courts of Illinois and Indiana, no distinction seems to be made between the doctrine of assumption of risk and of contributory negligence, but the facts of the cases, as well as the language of the courts, support the doctrine for which the *Green* case contends. We conclude, therefore, that the trial court did not err in holding that the doctrine of assumption of risk was not available to the appellant as a defense to the respondent's cause of action.

The appellant next contends that the court erred in refusing to rule, as a matter of law, that the respondent was guilty of contributory negligence. All that the evidence shows on this question is that the respondent continued in his work after he had knowledge of the fact that the collar and set screw which caused his injury were uncovered. But it will hardly do to say that an employee is guilty of contributory negligence for merely working in a dangerous place when he does not assume the risk of injury tor working therein. It is true that in such cases contributory negligence and assumption of risk approximate, and it is difficult to draw a line between them, but we think that, to convict an employee of contributory negligence for working in a place where he does not assume the risk of injury, it must be shown that he did not use care reasonably commensurate with the risk to avoid injurious consequences; in other words, that it was some negligent act of his own that caused his injury, and not alone the dangers of his situation. *Narramore v. Cleveland etc. R. Co.,* 96 Fed. 298, 48 L. R. A. 68.

Appellant's requested instruction No. 3 was properly re-fused for the reason that it assumed that the appellant had furnished the respondent with a reasonably safe place in which to work, the very question at issue. The other as-signments of error are met by what is said on the questions of assumption of risk and contributory negligence.

The judgment is affirmed.

MOUNT, C. J., HADLEY, and DUNBAR, JJ., concur.

ROOT, J. (dissenting)—Notwithstanding the profound re-spect which I entertain for the writer of the foregoing opin-ion and for my associates who concur therein, I cannot escape the conviction that they have, in this instance, fallen into error; and as I regard the error radical and susceptible of far-reaching, detrimental effects, I feel constrained to dissent, and to express my views upon the main question involved.

The majority opinion, upon the question of assumed risk, is based upon what this court said in *Green v. Western American Co.,* 30 Wash. 87, 70 Pac. 310; and what was there said upon said subject was based upon the case of *Narramore v. Cleveland etc. R. Co.,* 96 Fed. 298, 48 L. R. A. 68, wherein it was held that a defendant could not plead, or avail himself of the defense of, assumed risk, in an action by a servant for damages caused by the neglect of the master to comply with the provisions of a statute. In other words, it held that the principle of *Volenti non fit in-juria* does not apply where a statute is violated, even though the statute does not so expressly provide. For the sake of brevity I will refer herein to this proposition as the *"Narramore* doctrine."

In the case at bar the trial court held, and respondent contends, that the act of March 6, 1903 (Laws 1903, p. 40), commonly known as the "Factory Act," cut off the defense of assumed risk where a servant sues for damages caused by dangerous machinery left exposed in violation of said statute. It is conceded that this respondent could not recover were

it not for the factory act. It is admitted that "assumption of risk" would be a perfect defense herein but for said statute. Under the law of this state, up to the time said statute went into effect, said defense could be interposed in a case comprising the facts of the case at bar, and would constitute a complete bar to recovery. All of this is conceded by respondent herein. But it is contended that said factory act changed the law so that now a defendant cannot interpose said defense to such an action. As it is conceded that the change has been produced by this statute, let us examine it. Every effect must have a cause. If this statute has destroyed the defense of assumed risk, we will, of course, find therein the cause that has produced that effect. Here is the statute:

"An Act providing for the protection of employees in factories, mills or workshops where machinery is used and providing for the punishment of the violation thereof.

*"Be it enacted by the Legislature of the State of Washington:*

"§ 1.    That any person, corporation or association, operating a factory, mill or workshop where machinery is used, shall provide and maintain in use proper belt shifters or other mechanical contrivances for the purpose of throwing on or off belts or pulleys, proper safeguards for all vats, pans, trimmers, cut-off, gang edgers and all other saws that can be guarded advantageously, planers, cogs, gearings, belting, shafting, couplings, set screws, live rollers, conveyors, manglers in laundries and machinery of other or similar description. Exhaust fans of sufficient power shall be provided in the discretion of the commissioner of labor for the purpose of carrying off dust from emery wheels, grindstones and other machinery creating dust, where same is operated in an enclosed room or place. If a machine or any part thereof is in a dangerous condition, or is not properly guarded, the use thereof is prohibited, and a notice to that effect shall be attached thereto. Such notice shall not be moved until the machine is made safe and the required safeguards provided.

"§ 2.    All hoistways, hatchways, elevator wells and wheel holes, as well as fly wheels and stairways in factories, mills, workshops, storehouses, warerooms or stores, shall be securely

fenced, enclosed or otherwise protected and due diligence shall be used to keep all such means of protection closed, except when it is necessary to have the same open, that the same may be used.

"§ 3.    That any person, corporation or association operating a factory, mill, or workshop where machinery is used, shall provide in each workroom thereof proper and sufficient means of ventilation.

"§ 4.    Any person, corporation or association who violates or omits to comply with any of the foregoing requirements or provisions of this act, shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not less than twenty-five nor more than one hundred dollars, or by imprisonment for not less than fifteen days nor more than ninety days.

"§ 5.    A copy of this act, together with the name and address of the commissioner of labor printed in a legible manner, shall be kept posted in each department of every factory, mill or workshop and in the office of every public and private work, upon the employer or his agent or superintendent being supplied with sufficient copies thereof by the commissioner of labor."

Having read the statute, let us ask some questions as to its contents. Does it say that "assumed risk" shall not be permitted as a defense where a violator of the statute is sued by a servant injured by reason of such violation? No. Does it say anything about "assumed risk?" No. Does it say anything about defenses of any kind? No. Does it directly or indirectly say anything about actions for personal injuries? No. Does it say that the penalty therein provided may be augmented by depriving the defendant in a damage case of the defense of assumed risk and thereby mulcting him in damages? Nothing of the kind. Does it say anything about civil liabilities or actions? Nothing. It is a criminal statute. Its provisions are clear and easily understood. Its language is plain. Its penalty is definite and expressed in unmistakable terms.

The purpose of a statute is to put in definite, concrete,

enduring form the intention and decision of the state (acting through its lawmaking department) as to what the law shall be upon the subject-matter of such statute. That intention and that decision are expressed by, and must be gathered from, the language used. If the language be vague, ambiguous, indefinite, or uncertain, it then becomes the duty of the courts to construe it. If said language is susceptible of two or more constructions, the court may consider the general purpose of the statute, the evil (if any) sought to be corrected, and any other matters that will aid in arriving at the meaning the statute-makers intended to convey by the language employed. But if the language is plain and unequivocal, there is then no room for construction. The language must then be understood as having its usual and ordinary significance. The language of this factory act is clear, plain, and without ambiguity. Its meaning can be readily understood. When the legislature attempts to change the law of the state upon a given subject, by creating a statute covering such matter, the citizens of that state have a right to look to the language of such statute for the change intended and effected. The extent of the change must be ascertained from the terms of the statute itself. The court which gives to a statute a meaning which none of its terms sustain, is thereby *creating* law—a thing the court has no right to do.

Applying the foregoing facts and principles to the case at bar, it will be seen that there is no authority for holding that this statute destroyed the defense of assumed risk in a case of this kind, or any kind. There is nothing in the title or body of the statute expressing or indicating any such purpose. It being conceded that the defense would still be valid were it not for this statute, and it being shown that the statute does not mention or refer to the matter in any manner whatever, it would seem to be logically demonstrated that no change was made. It is axiomatic that a thing cannot be changed unless something changes it. It would seem to be

equally evident that a rule of law is not changed by a statute that does not mention, refer to, or in any manner deal with, said rule of law. If the legislature had intended this statute to cut off the defense of assumed risk, it could easily have placed therein language to evidence that intent. It did not do so. It gave no expression whatever of any such purpose. How this court can find that the legislature intended by this statute to defeat this defense, when the statute contains not a word indicating such an intention, is a query to which I have received no satisfactory answer.

Congress, in enacting a law requiring certain classes of railroad companies to use automatic car-couplers, expressly provided that the servant should not be deemed to have assumed the risk where the master violated said statute. To cut off this defense, Congress evidently deemed it necessary to expressly enact a provision to accomplish said result. It seemed to deem some expression of its intention essential to effectuate such purpose. Numerous legislatures have deemed it necessary, in order to prevent assumption of risk, to expressly provide therefor by statute. Code of Iowa (1897), §§ 2071, 2492; Laws of Texas, 1891, ch. 24, p. 25; Laws of Florida, 1891; Laws of Wyoming, 1890-91, ch. 28, p. 141; 2 Burns' Ann. Ind. Stats. (1901), § 7087, subd. 5. I think our legislature would have done the same had it intended to accomplish the result mentioned.

If anything further were necessary to show that the legislature did not intend to cut off this defense, it may be found in the history of this legislation. The bill which became the factory act was introduced in the legislature at the same time with another bill expressly providing for the cutting off of the defense of assumed risk in this kind of an action. This bill was known as the "assumed risk bill." It and the factory bill were before the same legislature at the same time. The factory bill was passed; the assumed risk bill was defeated. Now this court is asked to do what the legislature refused to do. If its originators believed that the

factory bill would have the effect, when enacted, of cutting off assumed risk, why did they introduce a separate bill for that express purpose? If the legislature intended to prevent the plea of assumed risk, why did it not pass the bill then before it providing for that very purpose? Why did it defeat that bill if it desired its contents to become the law? The passage of the assumed risk bill, or the incorporation of its substance in the factory bill, would have been a natural course to have pursued had the legislature intended to prevent the defense in question. In the face of a record like this, we are asked to hold that the legislature intended the factory act to cut off this defense—that it intended the courts to hold that the proposition which it defeated should be read into a separate and distinct statute, passed at the same session, which statute neither mentions nor refers to the matter in any manner whatever. I cannot bring myself to believe that the legislature intended to be considered as having enacted a proposition which its record shows to have been before it for consideration and to have been voted down.

But several contentions are made by respondent and by the few courts adhering to this doctrine, in its support. First: It is urged that the statute would be a "dead letter" and ineffective if it be not given such force. Second: It is argued that assumed risk is based upon contract, and that to permit such defense in a case like this would be to permit master and servant to contract to violate the law. Third: It is claimed that the welfare of employees, as a class, requires such an effect to be accorded the statute. Fourth: It is insisted that this court is committed to this doctrine by reason of its decision in the case of *Green v. Western American Co.,* *supra.* It will be seen that these arguments fail to meet the proposition that the factory act does not assume to make any change in the pre-existing law as to assumed risk. Every one of these arguments ignores this proposition. None of them can prevail against this material, indisputable fact, which stands at the threshold of this inquiry.

Let us notice these arguments *seriatim*. The contention that the court must accord this effect to the statute or otherwise the evident purpose of the statute (to make the working place of employees as safe as possible) will not be attained, is an argument, the impropriety of which is readily apparent. In order to make the statute effective this court is asked to import a provision which the legislature never placed therein. The statute is penal. The penalty for violating its terms is clearly expressed. But we are told that this penalty is not sufficient to make mill owners obey the statute. We are told that it will be a "dead letter" unless this court adds to the penalty by taking from a violator the benefit of the defense of assumed risk. The size and character of the penalty of this statute were matters for the legislature to determine. It did so. For this court to say that the legislature exercised poor judgment and did not prescribe a penalty sufficient to make the statute respected and effective, would be to indulge in a criticism upon a coordinate branch of the government concerning a matter resting peculiarly in its province. For this court to attempt to remedy an alleged ineffective statute by adding thereto, or importing therein, a provision not placed there by the legislature, would be a clear case of usurpation. Suppose the trial court had made a formal order to the effect that there should be added to the factory act the following words, to wit: "No mill owner when sued by an employee for damages caused by the violation of this statute shall be permitted to plead the defense of assumed risk." Would this court uphold such an order? If it should do so, would anybody doubt that its action was in defiance of all constitutional authority? Now, the superior court did not by an order add, or assume to add, those words to the statute. But it did something which had the same result. It gave the statute the force that it would have if those words were incorporated therein. It gave to the statute a meaning which its language did not justify and which it could only have by treating it as containing

the words above referred to. If a court can give a statute a meaning and effect which none of its language conveys or produces, there would seem to be no logical reason why it might not order the statute amended by adding the words which would express such meaning and effect. That the court cannot legally add language to a statute will, of course, be conceded. It would seem to be equally clear that the court cannot add to a statute a meaning and effect which is not therein expressed in any form whatever.

In justice to the trial judge it should be stated that the record shows that he based his rulings regarding this question upon the case of *Green v. Western American Co., supra.* If this court holds this statute to have the effect respondent contends for, it will, in my opinion, be a clear case of judicial legislation. So long as a statute is constitutional, it is not for the court to say that the legislature failed to accomplish what it desired, or what it ought. The moment the court does this, it transcends its constitutional powers. We are to deal with statutes as enacted; not as we may think they ought to be. If the court can add to or take from, or otherwise modify, the valid provisions of one statute, it can do the same with any other statute. If this court can legally add to this statute the effect sought by respondent, there would seem to be no reason why it might not add to any statute any provision (in effect) which in its opinion would be an improvement on the work of the legislature. The confusion to follow the adoption of such a doctrine can be readily foreseen. Hence it must be evident that this court can give no heed to the argument that this statute would be ineffective and a "dead letter" unless construed to have an effect which its terms are incapable of producing. Such argument is proper to be addressed to the legislature. It invokes the exercise of legislative power. The constitution has not vested the courts of this state with such power.

The argument that to permit the defense of assumed risk in this case would be to allow master and servant to contract

for a violation of the law, is clearly illogical and unsound. Under the common law, as it existed in this state at the time of the passage of the factory act, it was the duty of the master to give the servant a reasonably safe place in which to work. A master permitting a servant to work about a dangerous set screw, situated as was the one that injured this respondent, would be clearly guilty of negligence. Under this statute, he is likewise guilty. As applied to the facts of this case, the statute made no change in the duty of appellant to respondent. It is conceded that appellant could have pleaded "assumed risk" under the common law. If it was not unlawful for the servant to assume the risk when the common law required the master to furnish him a safe place, why is it unlawful because the statute makes the. same requirement? The duty of the master is the same in each instance. A duty imposed by common law is just as binding as one imposed by statute. *Langlois v. Dunn Worsted Mills* (R. I.), 57 Atl. 910.

A contract void because obnoxious to a statute would also be void if contravening an established principle of the common law. A contract to commit a felony would be void regardless of whether the contemplated crime were an infraction of statute or the common law. The converse of each of these propositions is equally true. A contract that is not inimical to a given principle of the common law is not antagonistic to the same principle when enacted as a statute. An executory contract to violate a valid statute would not be enforcible. It would make no difference whether it were a penal statute or otherwise. But such contract would be virtueless not merely because it provided for violating a *statute,* but because it contemplated the violation of the *law.* A contract to violate an unconstitutional statute would not be void. It is not the *form* of the law that makes an agreement to violate it impotent; it is the *fact* that it *is* the *law.*

If the duty of the master to furnish a safe place, and the obligation of the servant to assume open and apparent dan-

gers, were solely matters agreed to by them in the contract of employment, it would make no difference whether these obligations were imposed by statute or common law. In the absence of statutory restriction—and the statute in question has none — the same defenses are available in these actions as were permitted before the statute was enacted. The argument of respondent upon this point is based upon the theory that "assumed risk" rests upon contract. This theory is correct, if at all, only in a qualified sense. Instead of arising from the contract of employment made by the parties, it is based upon broader grounds, considerations involving the contract, public policy and the *status* which the parties acquire by reason of the employment and the conditions surrounding the working place. The doctrine *Volenti non fit injuria*—"One who knowing and appreciating a danger voluntarily assumes the risk of it"—is so in accord with common sense and right that its application cannot be deemed to have been denied unless by language clearly evidencing such an intention.

When a master and servant enter into a contract of employment, a condition or *status* is created which the law deems a matter of public concern. Therefore, the law steps in and imposes certain reciprocal duties and obligations upon each of the contracting parties. It says to the master: "Public policy requires that you give the servant a reasonably safe place in which to work; this obligation is therefore imposed upon you." It says to the servant: "Public policy requires that you use your faculties, as an ordinarily prudent man would, to avoid injury." It says further to the master: "If you negligently fail to keep the servant's working place reasonably safe, you must respond in damages if such negligence causes him injury." It says further to the servant: "You must assume such dangers of your working place as are open and apparent to you." The theory of respondent is that all of these matters are read into the employment contract; that they are parts and parcels of the employment

agreement. This is not the case. They are not portions of the agreement. They are more than that. They are obligations placed upon the respective parties by operation of law, and are so imposed from considerations of public policy. The state, having an interest in the safety and health of its citizens, provides that while employed as servants they must be furnished with reasonably safe working places. It also recognizes the fact that many kinds of work must be necessarily done in places where dangers cannot be entirely eliminated. Men who work in such places ordinarily get higher wages by reason of said dangers. The work must be done. Somebody must do it. The law says to the servant: "Yes, you may contract to work in the presence of those known dangers, but it is only fair that you assume the risk of injury therefrom; therefore, this liability is placed upon you." The servant does not agree to this burden as a part of his contract. It is not a matter of his agreement. It is an obligation imposed upon him by the law. It becomes applicable to him because of his *status* as a servant working in such a place.

That it is not a part of his contract, in the ordinary sense, may be seen from the fact that he and the master cannot make a valid agreement for him not to assume the open and apparent dangers, any more than they can make a binding agreement releasing the master from the duty of furnishing a safe place. These are reciprocal duties of master and servant, which cannot be made the subject of contract, and the law sanctions no contract releasing either from these duties by law imposed upon them respectively. They were imposed by the common law and have not been changed by the statute. If assumed risk were a matter of contract, it could, by agreement of the parties, be dispensed with in any given case. So could the duty to furnish a safe place under common law; but the law never sanctions an agreement for such waiver. But it does release each under certain circumstances. For instance, a servant working under a master's

promise to repair is exempted from assuming the risk; and
a master is exempted from liability for injuries caused by
dangers which to the servant are open and apparent. Neither
of these exemptions occurs as a consequence of agreement,
but they are the result of the law applicable to the given
conditions.

To show that the assumption of risk is not merely a matter
of contract, let us use the following illustration: A servant
agrees to work for five years at a given compensation in a
mill where he knows that the machinery is not guarded.
After working there a year, the legislature enacts a statute
requiring that machinery to be guarded and expressly cutting
off the assumption of risk and the right to plead the same.
The master ignores the statute and the servant is injured
by reason of said neglect. He sues. The master pleads
"assumed risk." The servant sets up the statute. The
master says the statute is unconstitutional, because it im-
pairs the obligation of his contract with the servant, wherein
the latter impliedly agreed to assume the risk. Would a
court hold this contention good? Not at all. Yet it would
be absolutely good if the assumption of risk were merely a
matter of contract.

One kind of a valid contract cannot be impaired any more
than another. No attempt is made by the statute to do
away with any of the obligations of master or servant. The
factory act merely puts in statutory form the principle, long
existing, which requires the master to make the working
place reasonably safe. It requires certain things to be done
in order to have the working place regarded as reasonably
safe. In order that this duty of the master might be better
observed, the statute made its neglect a criminal offense pun-
ishable by fine. The statute says nothing about releasing
the servant from any obligation then existing at law. Its pur-
pose was to make applicable in certain cases, and secure the
enforcement of, the common law, already existing; to compel,
by fear of penalty, the performance by the master of cer-

tain acts deemed by the statute-makers as essential to the performance of his common-law duty of furnishing a safe place to the servant. The effect of the statute was to make the omission of these specified acts conclusive proof of neglect of duty to the servant and to render the master criminally liable therefor. It was never intended to affect the contractual relations of the parties, other than as above stated. It did not remove, or assume to remove, any of the duties imposed by common law upon the servant. It said nothing on the subject and does not directly or indirectly refer thereto. No restrictions upon the right to contract are made by the statute. No change whatever being made as to the obligations of the servant, it follows that he was still charged with the duty of using his faculties to avoid danger and with the burden of the risk of open and apparent dangers. Being placed by law under these obligations, they may be pleaded against him.

When respondent entered appellant's employ, he did not by his contract agree to assume the risk from open and apparent dangers, but he knew that the law imposed that assumption upon him. He knew that he assumed the risk from this set screw, which for two weeks he saw constantly rendering his working place dangerous. As he elected to continue work beside this open danger, public policy and good conscience forbid that he should now be permitted to say that the law as to assumption of risk should not be applied to him. This defense can be interposed against him not because he agreed that it might, but because the law says it may. Having voluntarily accepted an employment and continued to work under conditions that he knew made him subject to the application of the doctrine of assumed risk, he is now estopped to say that it should not be applied. The law forbids him to complain of the master's omission, which he tacitly, if not expressly, consented to by working in the place known by him to be dangerous by reason of said omission.

As to the argument that the welfare of employees as a class requires that this statute be given the force contended for by respondent, I regard the same as both unsound and mischievous.  For this court, in order to favor a certain individual or special class of people, to read into a statute something which the legislature never placed therein, would be to undermine one of the fundamentals of our government.  "Equality before the law" is the priceless heritage of every American citizen.  The rich and the poor, the great and the small, the pauper and the millionaire, the workingman and the capitalist—are each and all entitled to every right the law gives and should be required to bear every burden the law imposes.  The law is no respecter of persons; and the moment a court assumes to distort a statute, or "bend" the law, as a favor to one and a disadvantage to another, that moment violence is done to one of the most sacred principles of our constitutions.  In dealing with questions arising from the relations of capital and labor, or master and servant, there is but one proper method for courts to pursue, and that is to interpret the law fairly, honestly, and with absolute impartiality.  Alike impervious to the influences of either class, the supremacy and dignity of the law should at all times be sustained by a fearless, firm, and unwavering hand.  Neither employer nor employee has any right to ask or expect that statutes will be construed any differently for him, or by any other rule, than is done for other citizens.

While importing into this statute the substance requested by respondent would be to his advantage, it would react upon employees generally, as a wrongful decision or unjustifiable official act invariably does upon those intended to be its beneficiaries.  Honest workingmen do not ask or expect anything wrong or illegal.  They will not sacrifice their manhood or the honor and dignity of labor upon the altar of covetousness or demagoguery.  They are entitled to a fair and fearless execution of every law calculated for

their benefit. Their rights and interests should be carefully and. constantly upheld. And one of the greatest needs is protection from unwise friends who, in their name, too often ask for considerations unjust, illegal, and wrong. An unrighteous verdict and judgment favorable to a certain workingman is an injury to the workingmen as a class. It must frequently happen that the question of merit is a close one, of fact or law, and the bringing of such an action is in no wise reprehensible either on the part of plaintiff or his attorney.

In passing, I desire to say that, by reason of what was said in *Green v. Western American Co.,* I feel that respondent herein and his attorney were abundantly justified, as a matter of ethics, in prosecuting the case now at bar. But the error—as I conceive it to be—of that case should now be corrected, and the doctrine that a statute may be supplemented by a court so as to favor any special class should be repudiated. If we have a right to add to a statute in order to make it specially benefit mill operatives, we can, with equal right and propriety, do the same thing for the benefit of miners, brokers, farmers, bankers, corporations, trusts, or any other class we may, in a given instance, desire to favor. A statute such as the factory act directly affects one of the leading industries of our state and indirectly many others. If it and kindred statutes are not to be understood according to the plain import of their language, but are to be given such interpretation as the court may think most advantageous to employees, it can be readily seen that the situation will not be inviting to people having capital to invest in pursuits requiring the employment of labor. The greatest material need of our state at the present time is capital with which to develop our natural resources. No class of our people desire and need this more than our workingmen. Every decision such as respondent now asks for is a barrier to such investments; and the worst sufferers are the very workingmen in whose interest it is claimed

such a decision would result. The best interests of capital and labor require that they go hand in hand. He that teaches a different doctrine is not a wise friend to either. Neither needs any consideration in the administration of the law except honesty, fairness, and impartiality. To these each is absolutely entitled as a matter of law, justice, and right. Capital is timid, and few things are better calculated to frighten it than uncertainties in the law and partiality and innovations in the manner of its administration by the courts. The highest welfare of our laboring people demands a fair, fearless, and impartial application of the law to capital according to established and recognized principles of jurisprudence. Such statutes as this factory act should be given a liberal construction, and every reasonable intendment should be accorded in order to effectuate the humane purpose intended. But construing a statute liberally is a very different thing from injecting into a statute a provision not there when enacted. The statute in question should be interpreted by the well-established rules which the law commonly employs in ascertaining the meaning of statutes. Otherwise, the jurisprudence of our commonwealth will be lacking in that certainty and stability essential to the welfare of a state.

*Stare decisis.* It is argued that what was said by the writer of the opinion in *Green v. Western American Co., supra,* committed this court to the *Narramore* doctrine. In that case plaintiff was working as a miner for the defendant company. A statute made it the duty of the company to deliver, at a certain place, timbers to be used by plaintiff in making and keeping his working place safe. The company did not do this. Plaintiff complained. The company told him to go ahead with his work and the timbers would be promptly furnished him. Relying upon that promise, he did so, and was injured before the timbers came. The court held, very properly, I think, that he had a right to rely upon that promise. The law is well settled in this and

other states that a servant has a right to rely upon such a
promise, and does not, during a reasonable period of time,
assume the risk of dangers which the master, under said
promise, is expected soon to provide against.   Hence, the
judgment in that case was justified upon that ground.   As
to whether or not the statute prevented the plea of "as-
sumed risk," was a question entirely unnecessary to decide.
But the learned judge who wrote the opinion saw proper to
quote at length, with approval, from the case of *Narramore
v. Cleveland etc. R. Co., supra,* although he does not, at
any length, discuss the question as an original proposition.

In view of these facts, I do not feel that the judges who
signed that opinion should be regarded as irrevocably con-
cluded by what was said upon a secondary question, in no
manner essential to the conclusion reached upon the main
issue.   Neither do I think the court should now feel itself
bound by the language of an opinion bearing upon a sub-
sidiary question, which the court was not required to in-
vestigate, and upon which there was no occasion to express
an opinion.   But when that question comes as the para-
mount issue in the case, and its examination shows that the
former language of the court was based upon a misconcep-
tion of the law, and that to give such sentiments the force
of decision would be to announce a principle at variance
with the overwhelming weight of authority, against sound
reason, contrary to well-established principles of jurispru-
dence, and detrimental to the best interests of the state—it
would seem that the court's duty was plain.   The doctrine of
*stare decisis* is proper to be observed in appropriate cases.
But it would be a startling proposition to assert that it must
always be controlling.   If there is any court that has not,
at some time, changed its former rulings, I am not aware
of it.   The books furnish many instances of decisions hav-
ing been subsequently overruled, and not infrequently by
the same, or practically the same, personnel.   See, *Birming-
ham R. & Elec. Co. v. Allen,* 99 Ala. 359, 13 South. 8, 20

L. R. A. 457. This being true, how much less hesitancy should exist in a case where it is not a question of the court overruling a decision, but merely a matter of deciding correctly a question upon which it made lightly considered observations in a case where such question was unimportant and not decisive. Courts are composed of human beings. No human institution is perfect. That courts will sometimes fall into error is to be expected. It is unavoidable, in the nature of things. To pretend, or act upon the assumption, that they do not (as would be the effect of always being controlled by *stare decisis*) would be for a court to attribute to itself an infallibility it does not have, and which everybody knows it not to possess. The argument that a court cannot command respect if it reverses its decisions is sound only to the extent that it should not do so without good, potent reasons. But in personal affairs, honest and intelligent people have a profound respect for the man who, when he makes a mistake and detects it, has the moral courage to admit and correct it. A court that acts upon the same principle, so far as logically applicable, will not, on that account, be without the respect of right thinking people. This court now has before it the question of whether or not the *Narramore* doctrine shall be engrafted upon the law of this state. Few decisions of this court were as far reaching in their effects as will be this. The absolute uncertainty to arise from the adoption of this doctrine will materially embarrass all industrial activities in this state.

Let us now notice the authorities. This factory act has never been before this court for consideration. But it has been passed upon by United States District Judge Hanford, presiding in the circuit court, in the case of *Nottage v. Sawmill Phoenix*, 133 Fed. 979. He expressly declined to approve the *Narramore* doctrine, but held that the statute did not forbid the plea of assumed risk. The eminent and unquestioned ability of this experienced jurist must command, for the first judicial interpretation of this statute, the pro-

found respect of both bench and bar. Among other things, he said:

"This is a penal statute, enacted by the legislature in the exercise of the police power of the state, and it contains no provision purporting to affect in any way the rules of law applicable to civil actions. It gives no hint of an intention to confer upon injured employees any new right enforceable in an action to recover damages, nor does it express a legislative intent to change the common law by abolishing defenses recognized by the common law, nor does it prescribe an arbitrary rule of evidence, like the provision contained in the act of Congress making the use of automatic couplings on railroad trains compulsory, which prescribes, in effect, that trainmen shall not be deemed to have assumed the risk of injuries from their employment on trains not provided with automatic couplers. See U. S. Comp. St. 1901, vol. 3, p. 3176. . . . The courts have no authority to extend or amplify the provisions of statutes so as to make them comprehend additional rights and remedies which the legislature omitted to provide. A statute which is plain and free from ambiguities is not subject to judicial construction, but must be interpreted by the courts and enforced according to the legislative intention expressed by its words. It is not true that the purpose of the statute will be defeated by a decision of a controversy between individuals involved in a civil action in accordance with the long-established rules of the common law. It may be fairly inferred that the legislature did not intend to encourage this class of litigation, which is already stimulated to abnormal proportions by the solicitations of employment by specialists, but preferred, as a means of protecting employees in factories from the consequences of recklessness in the use of dangerous agencies, to make the unnecessary use of unguarded machinery criminal and punishable. The real intention of the legislature is made apparent by the fact that the law does not discriminate between employers and employees. It is not a law subjecting only the owner or manager of a mill or factory or an employer of labor to the penalties prescribed, but section 4 applies generally to every 'person, corporation or association who violates or omits to comply' with the requirements of the act. Section 1 provides that, if a machine is not

properly guarded as required, the use thereof is prohibited; therefore an employee in a mill who operates an unguarded saw commits a prohibited act, and is a violator of the statute, and subjects himself to punishment as provided in section 4. . . . There is no substantial difference between an agreement which is unlawful because harmful and an agreement to do an act prohibited by a statute. In either case the unlawfulness of the agreement constitutes a bar to its enforcement by judicial proceedings."

The circuit courts of appeals of the Second and Eighth Circuits have passed upon statutes similar to our factory act, and have held that they did not cut off the defense of assumption of risk. That of the Seventh Circuit seems to have pratically held likewise. The able attorney for respondent herein, noted for his industry and familiarity with the decisions, only claims five states as supporting the *Narramore* doctrine, viz: Indiana, Michigan, Missouri, North Carolina, and Vermont. Opposed to said doctrine, stand the courts of last resort of the following states, to wit: New York, Pennsylvania, Massachusetts, Illinois, Wisconsin, Minnesota, Alabama, Iowa, Rhode Island, and Colorado. Of the five states cited by respondent, the decisions in two of them (North Carolina and Vermont) appear to be affected by statutory provisions not to be found in our statutes. And in another of these states (Missouri), the United States circuit court of appeals held the other way—upholding the defense nothwithstanding the statute.

In the *Narramore* case the writer of the opinion does not claim it to be in accord with the weight of American authority, but assumes to rest it upon English decisions. With due respect to the learned and distinguished jurist, I am led, by an examination of the cases, to believe that the English cases do not sustain his position. The principal English case upon which he relies is *Baddeley v. Granville,* 19 Q. B. D. 423, from which he makes a quotation, indicating a meaning which I regard as at variance with that of the opinion taken as a whole. The following cases will show that the

*Narramore* doctrine is not the law in England: *Thomas v. Quartermaine,* 18 Q. B. D. 685; *Yarmouth v. France,* 19 Q. B. D. 647; *Smith v. Baker & Sons,* [1891] A. C. 325; *Osborne v. London etc. R. Co.* 21 Q. B. D. 220; *Walsh v. Whiteley,* 21 Q. B. D. 371; *Britton v. Great Western Cotton Co.,* L. R. 7 Ex. 130.

In the case of *St. Louis Cordage Co. v. Miller,* 126 Fed. 495, at page 509, the circuit court of appeals for the Eighth Circuit, in discussing a factory act similar to ours, said:

"The factory act of Missouri (2 Rev. St. 1899, § 6433) does not abolish the defense of assumption of risk in cases which fall under its provisions. In this respect it differs from the act of the Congress of the United States (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), which requires cars engaged in interstate commerce to be equipped with automatic couplers. Congress in that act expressly provided that in case the railroad companies failed to comply with its terms the employees should not be deemed to have assumed the risk thereby occasioned. Act March 2, 1893, c. 196, § 8, p. 532, 27 Stat. 532 [U. S. Comp. St. 1901, p. 3176]. The Legislature of Missouri had power to apply a similar provision to cases in which employers failed to keep their machinery safely and securely guarded, but they did not do so. The negligence of the master to safely and securely guard his machinery in accordance with the provisions of the law of Missouri is of the same nature as his negligence in providing a reasonably safe floor or ax or other tool or appliance, and there is no reason why an action for a resulting injury should not be subject to the defense of assumption of risk in the one case to the same extent as in the other. And so it is under the law here under consideration."

The supreme court of Alabama, in an early case, made the same error that this court did in the *Green* case, concerning this same question. But when the matter came squarely before the court, and was thoroughly considered, as it was in the case of *Birmingham R. & Elec. Co. v. Allen, supra,* that court, in an able and exhaustive opinion, overruled its former holding and laid down the principle which I now contend

for. Said court did not permit *stare decisis* to interfere with the correction of an error, when convinced that it had committed such. The opinion is instructive, reviewing many authorities, including the leading English cases on the question.

The court of appeals of New York, in *Knisley v. Pratt,* 148 N. Y. 372, 377, 42 N. E. 986, 32 L. R. A. 367, uses the following language:

"In order to sustain the judgment in favor of plaintiff it is necessary to hold that where the statute imposes a duty upon the employer, the performance of which will afford greater protection to the employee, it is not possible for the latter to waive the protection of the statute under the common-law doctrine of obvious risks. We regard this as a new and startling doctrine calculated to establish a measure of liability unknown to the common law, and which is contrary to the decisions of Massachusetts and England under similar statutes. . . . We think this proposition is essentially unsound and proceeds upon theories that cannot be maintained. It is difficult to perceive any difference in the quality and character of a cause of action whether it has its origin in the ancient principles of the common law, in the formulated rules of modern decisions, or in the declared will of the legislature. Public policy in each case requires its rigid enforcement, and it was never urged in the common-law action for negligence that the rule requiring the employee to assume the obvious risks of the business was in contravention of that policy. . . . We are of opinion that there is no reason in principle or authority why an employee should not be allowed to assume the obvious risks of the business as well under the Factory Act as otherwise. There is no rule of public policy which prevents an employee from deciding whether, in view of increased wages, the difficulties of obtaining employment, or other sufficient reasons, it may not be wise and prudent to accept employment subject to the rule of obvious risks. The statute does indeed contemplate the protection of a certain class of laborers, but it does not deprive them of their free agency and the right to manage their own affairs."

The supreme court of Rhode Island, in *Langlois v. Dunn Worsted Mills* (R. I), 57 Atl. 910, 911, met this question squarely as follows:

"The question whether a plaintiff can recover.for a breach of statutory duty notwithstanding an assumption of risk or contributory negligence on his part is one on which there is some difference of opinion, but we think the clear weight of reason and authority is against such recovery.. A statutory duty is no more imperative in law than a common-law duty. A penalty may be imposed upon the offender for a breach of statute, but it does not change the relations between the parties, except to the extent that one entering the employ of another may assume, in absence of knowledge, that the terms of the statute have been complied with. . . . It is also well settled that a court will not presume that a statute is intended to change a rule of common law unless such an intent appears. . . . It has been common practice here and elsewhere to construe statutory duties in connection with assumed risks and contributory negligence. For example, ever since the advent of railroads, statutes have required the sounding of a bell or whistle in approaching a highway crossing. Yet, though the statute should be negligently disregarded, it has never been held that a plaintiff, seeing the approach of a train, and injured while attempting to cross ahead of it, could recover. He would be held to have assumed the risk of so crossing, or to have been guilty of contributory negligence. The mere fact that the railroad company had violated the statute would not warrant a recovery."

In the case of *Martin v. Chicago etc. R. Co.*, 118 Iowa 148, 91 N. W. 1034, 96 Am. St. 371, 59 L. R. A. 698, the court, in a well-considered opinion, discusses and disapproves of the *Narramore* case. Among other things the Iowa supreme court says:

"We think the learned judge, in writing that opinion, assumed too much, in treating the assumption of risk as purely a matter of contract. True, the books speak of it as resting on an implied agreement between the employer and employee. It is more accurate to say that the services of the one are engaged by the other, and from the relationship

the law implies certain duties, obligations, and disabilities.
No mention is made of these, but they pertain to the rela-
tionship of the parties and the status then assumed.  .  .  .
Nor can we approve of the distinction attempted to be drawn
between employment under conditions condemned as danger-
ous at the common law, and those prohibited by a city ordi-
nance.  In the absence of an assumption of the risk, an
omission of a duty implied by law is precisely as effective
in fixing liability as though enjoined by statute.  The obli-
gation of the employer to the servant is no greater in the
one case than in the other, and we can discover no sound
reason for the discrimination which declares the danger in
the one case may be assumed, and in the other may not.
.  .  .  Our study of the subject has led to the conclu-
sion that, in the matter of assumption of risks, it is im-
material whether they arise from the violation of a common-
law duty, or an obligation imposed by statute.  .  .  .
And it can make no difference whether the statute relates
to the condition of the place where the work is to be done,
or the method to be pursued in performing it.  If the em-
ploye, with full knowledge of either, undertakes to accomplish
the task assigned, at the place or in the method proposed, he
ought not to be permitted to complain, when conditions and
methods were precisely as he knew they would be, and to
which he has assented."

The supreme court of Massachusetts, in *O'Maley v. South
Boston Gas Light Co.*, 158 Mass. 135, 32 N. E. 1119, 47
L. R. A. 161, speaks as follows:

"The doctrine of assumption of the risk of his employ-
ment by an employe has usually been considered from the
point of view of a contract, express or implied, but, as ap-
plied to actions of tort for negligence against an employer, it
leads up to the broader principle expressed by the maxim,
*Volenti non fit injuria*.  One who, knowing and appreciating
a danger, voluntarily assumes the risk of it, has no just cause
of complaint against another who is primarily responsible
for the existence of the danger.  As between the two, his
voluntary assumption of the risk absolves the other from any
particular duty to him in that respect, and leaves each to
take such chances as exist in the situation, without a right
to claim anything from the other.  .  .  .  The statute

does not attempt to take away the right of the parties to make such contracts as they choose, which will establish their respective rights and duties. . . . It would be an unwarranted construction of the statute, which would tend to defeat its object, to hold that laborers are no longer permitted to contract to take the risk of working where there are peculiar dangers from the arrangement of the place, and from the kind or quality of the machinery used. Nothing but the plainest expression of intention on the part of the legislature would warrant giving the statute such an interpretation."

In *Swenson v. Osgood & Blodgett Mfg. Co.*, 91 Minn. 509, 512, 98 N. W. 645 (decided in 1904), the supreme court of Minnesota employed this language: ·

"Very much stress was laid upon the fact that by the laws of this state (Laws 1893, p. 99, c. 7, § 1; G. S. 1894, § 2248) the employer's obligation to properly protect and guard these cogwheels in a practicable manner had been made a statutory duty; but we have held, upon a previous consideration of this statute, that it does not change the general or common-law rule as to contributory negligence, or as to the assumption of risks by the employee."

Endlich, Interpreation of Statutes, § 5, says:

"What is called the 'policy' of the government, with reference to any particular legislation, is said to be too unstable a foundation for the construction of a statute. The clear language of a statute can be neither restrained nor extended by any consideration of supposed wisdom or policy. So long as a legislative enactment violates no constitutional provision or principle, it must be deemed its own sufficient and conclusive evidence of the justice, propriety and policy of its passage. The language of Mr. Justice Story, concerning constitutional construction, applies almost equally to that of statutes: 'Arguments drawn from impolicy or inconvenience ought here to be of no weight. The only sound principle is to declare *ita lex scripta est,* to follow and to obey; nor, if a principle so just could be overlooked, could there be well found a more unsafe guide or practice than mere policy and convenience.' "

And in § 7 the author continues:

"In short, when the words admit of but one meaning, a court is not at liberty to speculate on the intention of the Legislature, or to construe an act according to its own notions of what ought to have been enacted. Nothing could be more dangerous than to make such considerations the ground of construing an enactment that is quite complete and unambiguous in itself. 'The moment we depart from the plain words of the statute, according to their ordinary and grammatical meaning, in a hunt for some intention founded on the general policy of the law, we find ourselves involved in a sea of troubles. Difficulties and contradictions meet us at every turn.' Indeed, to depart from the meaning on account of such views, is, in truth, not to construe the Act, but to alter it. But the business of the interpreter is not to improve the statute; it is, to expound it."

Black, Interpretation of Laws, § 4, says:

"The wisdom, policy or expediency of legislation is a matter with which the courts have nothing whatever to do. Whether or not a given law is the best that could have been enacted on the subject; whether or not it is calculated to accomplish its avowed object; whether or not it accords with what is understood to be the general policy of legislation in the particular jurisdiction,—these are questions which do not fall within the province of the courts. And hence a court exceeds its proper office and authority if it attempts, under the guise of construction, to mould the expression of the legislative will into the shape which the court thinks it ought to bear. The sole function of the judiciary is to expound and apply the law. To enact the law is the prerogative of the legislative department of government. Nor can the courts correct what they may deem excesses or omissions in legislation, or relieve against the occasionally harsh operation of statutory provisions, without danger of doing more mischief than good."

In *Powell v. Ashland Iron & Steel Co.,* 98 Wis. 35, 41, 73 N. W. 573, the supreme court of that state said:

"In such a case it is immaterial that the danger might be guarded against by the employer, even if failure in that re-

spect be a violation of some statutory requirement on 'the subject. The responsibilities which, by the rules of the common law, the servant must assume and discharge for his own safety, are not affected thereby unless the statute expressly so provides."

The same court, in the case of *Helmke v. Thilmany,* 107 Wis. 216, 221, 83 N. W. 360, spoke as follows:

"They cite the statute requiring the owner or manager of any factory, workshop or other place where labor is performed to keep 'all belting, shafting, gearing, hoists, flywheels, elevators and drums therein, *which are so located as to be dangerous to employees in the discharge of their duty,'* securely 'guarded or fenced.' Sec. 1636j, Stats. 1898. There is no claim, nor ground for claiming that such statute precludes the defense of contributory negligence, nor the assumption of risk. *Thompson v. Edward P. Allis Co.,* 89 Wis. 523, 530. Similar statutes have been construed the same way. *Curry v. C. & N. W. R. Co.,* 43 Wis. 665, 683; *Holum v. C., M. & St. P. R. Co.,* 80 Wis. 299; *Dugan v. C., St. P., M. & O. R. Co.,* 85 Wis. 614; *Schneider v. C., M. & St. P. R. Co.,* 99 Wis. 387."

The majority opinion cites three Illinois cases. I think an examination of them will show that they are affected by statutory provisions which we do not have. The Illinois supreme court, in a case later than those cited, used the following language:

"Whether injuries which occur because of the violation by the master of municipal regulations enacted for the preservation of life and limb should be regarded as wilfull and not subject to the defense of contributory negligence, or to the defense of the implied assumption by the servant of the risks and dangers caused by such violation, is a question of public policy for the legislature, and not one for the courts. We can only apply the law as it is. *Browne v. Siegel, Cooper & Co.,* 191 Ill. 226, 235, 60 N. E. 815."

This language seems to show very plainly that the court does not cut off the defense of assumed risk unless the legislature has provided for so doing.

Dresser, Employers' Liability, § 82, says:

"When a person engages to work for another, both a contract and a *status* are created.. . . . Although the contract of hiring depends upon the same principles as other contracts, yet it has one peculiarity, in that it creates a *status* or relationship between the parties to which the policy of the law has affixed certain rights, duties, and disabilities to be observed by each, irrespective of any understanding or supposed agreement between them. These duties and disabilities arise when the relation is created, and continue until it ends, and for the most part are determined by the condition of affairs when the contract of hiring is made. It is usual and convenient to treat them as terms of an implied contract; but it is a contract implied from the relationship, and not from the agreement of the parties, and has none of the incidents of a technical contract."

2 Labatt, Master and Servant, §§ 649, 650, says:

"The general theory upon which the courts have proceeded is that, in the absence of language evincing a contrary intention on the part of the legislature, a statute which so far changes the common law as to impose upon a master duties to which he had not been before subject, or to render him liable for the negligence of certain classes of servants resulting in injury to other servants whose right of action would, if common-law doctrines were applied, be barred by the rule as to fellow employees, should not be construed in such a sense as to preclude the master from availing himself of any of those defenses which, as explained in § 255, *ante,* are based upon the fact that the injured person adopted a certain course of conduct with a full appreciation, actual or constructive, of the risk from which his injury eventually resulted. . . . In some instances the statutory provisions which are considered in this and the following chapters operate so as to convert what would be an ordinary risk under the common law into an extraordinary one. But unless this be their effect, they are not deemed to change in any way the rule that a servant assumes all the ordinary risks which are manifestly incident to the employment."

It must be remembered that some states have statutes expressly cutting off assumed risk, or expressly giving a right

of action for violation of the statute, in such terms as to effect that result—as will be shown by an examination of some of the cases cited in the majority opinion and by respondent.

The following authorities will show the attitude of the American courts and text-book writers upon this question, to wit: *Nottage v. Sawmill Phoenix,* 133 Fed. 979; *St. Louis Cordage Co. v. Miller,* 126 Fed. 495; *Cleveland etc. R. Co. v. Baker,* 91 Fed. 224; *Martin v. Chicago etc. R. Co.,* 118 Iowa 148, 91 N. W. 1034, 96 Am. St. 371, 59 L. R. A. 698; *Knisley v. Pratt,* 148 N. Y. 372, 42 N. E. 986, 32 L. R. A. 367; *O'Maley v. South Boston Gas Light Co.,* 158 Mass. 135, 32 N. E. 1119, 47 L. R. A. 161; *Birmingham R. & Elec. Co. v. Allen,* 99 Ala. 359, 13 South. 8, 20 L. R. A. 457; *Browne v. Siegel, Cooper & Co.,* 191 Ill. 226, 60 N. E. 815; *Mulhern v. Lehigh Valley Coal Co.,* 161 Pa. St. 270, 28 Atl. 1087; *Swenson v. Osgood & Blodgett Mfg. Co.,* 91 Minn. 509, 98 N. W. 645; *Williams v. J. G. Wagner Co.,* 110 Wis. 456, 86 N. W. 157; *Helmke v. Thilmany,* 107 Wis. 216, 83 N. W. 360; *Langlois v. Dunn Worsted Mills* (R. I.), 57 Atl. 910; *Victor Coal Co. v. Muir,* 20 Colo. 320, 38 Pac. 378, 46 Am. St. 299, 26 L. R. A. 435; *Grand v. Michigan Cent. R. Co.,* 83 Mich. 564, 47 N. W. 837, 11 L. R. A. 402; *McGinty v. Waterman* (Minn.), 101 N. W. 300; *McRickard v. Flint,* 114 N. Y. 222, 21 N. E. 153; *White v. Wittemann Lith. Co.,* 131 N. Y. 631, 30 N. E. 236; *Honor v. Albrighton,* 93 Pa. St. 475; *Anderson v. Nelson Lum. Co.,* 67 Minn. 79, 69 N. W. 630; *Fleming v. St. Paul etc. R. Co.,* 27 Minn. 111, 6 N. W. 448; *Chicago Packing & Provision Co. v. Rohan,* 47 Ill. App. 640; *Munn v. Wolff Mfg. Co.,* 94 Ill. App. 122; *Keenan v. Edison Electric Illum. Co.,* 159 Mass. 379, 34 N. E. 366; *Goodridge v. Washington Mills Co.,* 160 Mass. 234, 35 N. E. 484; 2 Labatt, Master & Servant, §§ 649, 650; 3 Elliott, Railroads, § 1315; 20 Am. & Eng. Ency. Law (2d ed.), 127; Dresser, Employers' Liability, §§ 82, 116; Bailey, Master's Liability, p.

480; 13 Law Mag. & Rev., 19; Roberts & Wallace, Duty
and Liability of Employers, 136, 146, 160, 161, 260; Bus-
well, Personal Injuries, §§ 207-209; Endlich, Interpretation
of Statutes, §§ 5, 7; Black, Interpretation of Laws, pp. 8, 234.

I think an examination will convince any one that the
weight of authority is against the *Narramore* doctrine; and
I believe the better reasoning to be decidedly so.

The justification for expressing my views at such length
must be found in the importance of the question involved,
and in the apprehension I feel in contemplating the far-
reaching effects of the court's decision. It seems to me that
the decision obliterates old landmarks of the law, and estab-
lishes an innovation neither justified nor desirable.

RUDKIN and CROW, JJ. (dissenting)—Believing that the
majority opinion is unsound in principle and against the
great weight of authority, we concur in the foregoing dissent.